**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 4, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ZEN MAGNETS, LLC,

      Plaintiff - Appellee/Cross-
      Appellant,

v.

CONSUMER PRODUCT SAFETY
COMMISSION,

      Defendant - Appellant/Cross-
      Appellee.

Nos. 19-1168, 19-1186

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CV-02645-RBJ)**
_____

David C. Japha, Levin Jacobson Japha, PC, Denver, Colorado (Evan House
with him on the briefs), for Plaintiff-Appellee/Cross-Appellant.

Jaynie Lilley, Attorney, Appellate Staff, United States Department of
Justice, Civil Division, Washington, DC (Joseph H. Hunt, Assistant
Attorney General; Jason R. Dunn, United States Attorney; Daniel Tenny
and Patrick G. Nemeroff, Attorneys, Appellate Staff, on the briefs), for
Defendant-Appellant/Cross-Appellee.
_____

Before **BACHARACH**, **McHUGH**, and **EID**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

The Consumer Product Safety Commission conducted two proceedings involving the making of small rare-earth magnets. The first proceeding consisted of a rulemaking affecting all manufacturers of these magnets. The second proceeding consisted of an adjudication affecting only one manufacturer: Zen Magnets, LLC. For the adjudication, the Commission needed to provide Zen with a fair proceeding under the Fifth Amendment's Due Process Clause. *Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975).

Zen contends that the adjudication was unfair for two reasons:

1. The Commissioners conducted the adjudication after engaging in a rulemaking on closely related issues.

2. Three Commissioners participated in the adjudication after making public statements showing bias.

The district court concluded that

- the Commission hadn't denied due process by simultaneously conducting the adjudication after a related rulemaking,

- two of the Commissioners (Kaye and Robinson) had not shown bias through their public statements, and

- one Commissioner (Adler) had shown bias through a public statement about Zen.

Both parties appeal. The Commission appeals the district court's decision as to Commissioner Adler. Zen cross-appeals, arguing that

- three Commissioners had violated due process by prejudging the issues and

2

- the district court had issued an advisory opinion on the merits.

Our jurisdiction extends to the parties' contentions involving due process. For these contentions, we conclude that the Commissioners' participation in the rulemaking and their statements did not result in a denial of due process. So we affirm the district court's judgment as to Commissioners Robinson and Kaye but reverse as to Commissioner Adler. We lack jurisdiction to decide whether the district court rendered an advisory opinion.

## I. The Commission conducts a rulemaking and a related adjudication.

Zen's small rare-earth magnets are shiny and smooth, resembling candies that commonly garnish cookies and desserts. The appearance sometimes leads young children to put the magnets in their mouths. Older children also sometimes put the magnets in their mouths to magnetize braces or mimic facial piercings. When put in children's mouths, the magnets are sometimes swallowed, lodging in the digestive system and causing serious injury or death.

The Consumer Product Safety Commission tried to address this danger through both rulemaking and adjudication. Through rulemaking, the Commission proposed a safety standard to either enlarge the magnets or weaken their magnetic strength. *See* Safety Standard for Magnet Sets, 77 Fed. Reg. 53,781, 53,787–88 (Sept. 4, 2012); 15 U.S.C. §§ 2056(a), 2058

3

(2018). The Commission approved the final rule in a public hearing in September 2014.[1] At that hearing, three of the Commission's members (Adler, Kaye, and Robinson) made statements about the risk posed by the magnets, the impossibility of mitigating that risk, and Zen's role as a magnet distributor.

Shortly after proposing the safety standard, the Commission initiated an adjudication by authorizing complaints against Zen and two other distributors of small rare-earth magnets. The complaints alleged that the magnets presented a "substantial product hazard." *See* 15 U.S.C. § 2064(a) (2018). The other two distributors entered into consent agreements with the Commission, leaving Zen as the only remaining distributor in the adjudication.

In that adjudication, an administrative law judge found that

- the magnets did not present a substantial product hazard when accompanied by appropriate warnings and age recommendations and

- the previous warnings had been inadequate.

Given these findings, the administrative law judge recalled the magnets that Zen had sold without adequate warnings or age recommendations.

---

[1] Our court later vacated the rule and remanded to the agency after a challenge from Zen. *See Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1144 (10th Cir. 2016).

4

Counsel for the agency appealed to the Consumer Product Safety Commission, and Zen sought recusal of Commissioners Adler, Robinson, and Kaye, arguing that they had improperly prejudged the adjudication based on

- the overlap between the issues in the rulemaking and adjudication and

- the Commissioners' public statements.

The Commissioners declined to recuse. Three years after passing the final magnet rule, the Commission decided that

- the magnets presented a substantial product hazard because a defect created a substantial risk of public injury and

- no warnings could mitigate the risk of injury.

Zen appealed to federal district court, renewing challenges to the participation of Commissioners Adler, Robinson, and Kaye and arguing that the Commission's decision was arbitrary and capricious under the Administrative Procedure Act. The district court ruled that (1) the decision was not arbitrary and capricious, (2) Commissioners Robinson and Kaye had not violated due process by participating in the adjudication after publicly remarking about Zen and its magnets, and (3) Commissioner Adler had violated due process by participating in the adjudication after publicly remarking about Zen and its magnets. The district court thus invalidated the Commission's final order.

After the district court issued its order, Zen filed a Rule 59(e) motion to alter or amend the judgment. In this motion, Zen asked the district court to vacate its conclusion that the Commission's reasoning was not arbitrary and capricious, characterizing this conclusion as an impermissible advisory opinion. The district court rejected this request.

## II. We conduct de novo review.

Our review is de novo. *N. M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001). The Commission's opening brief cites the standard to review a summary-judgment ruling, and the parties refer to their briefs in district court as cross-motions for summary judgment. *See* First Br. at 17; Appellant's App'x, vol. 2, at 398, 419. But the summary-judgment standard doesn't apply because the district court's decision involved an administrative appeal. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579–80 (10th Cir. 1994) (stating that district courts reviewing agency actions should function like appellate courts and "motions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal").

## III. We have jurisdiction over the Commission's appeal and part of Zen's cross-appeal.

Every appellant bears the burden of proving appellate jurisdiction by demonstrating the finality of the challenged decision or identifying a specific grant of jurisdiction. *EEOC v. PJ Utah, LLC*, 822 F.3d 536, 542

6

n.7 (10th Cir. 2016); *see* 28 U.S.C. § 1291 (2018). An administrative remand is not ordinarily considered a final decision. *Western Energy All. v. Salazar*, 709 F.3d 1040, 1047 (10th Cir. 2013). We thus generally lack jurisdiction over remands to administrative agencies. *Id.*

Both parties invoke the practical-finality exception for their appeals. We conclude that the exception applies to the Commission's appeal as to the disqualification of Commissioner Adler, and we exercise pendent appellate jurisdiction over Zen's cross-appeal as to the participation of Commissioners Kaye and Robinson. But we lack jurisdiction over Zen's cross-appeal on the refusal to vacate the district court's opinion as an advisory opinion.

### A. We have jurisdiction over the Commission's appeal under the practical-finality exception.

Though appellate jurisdiction requires finality, we construe the term "finality" based on practicality. *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152 (1964). With this lens of practicality, we sometimes regard a district court's remand to an agency as "practically final." *Western Energy All. v. Salazar*, 709 F.3d 1040, 1049–50 (10th Cir. 2013). A district court's remand is practically final when it is urgent that an issue be decided because it is important, serious, and unsettled. *Bender v. Clark*, 744 F.2d 1424, 1427 (10th Cir. 2013).

7

To decide whether a decision is practically final, we ask whether "the danger of injustice by delaying appellate review outweighs the inconvenience and costs of piecemeal review." *New Mexico v. Trujillo*, 813 F.3d 1308, 1317 (10th Cir. 2016) (quoting *United States v. Copar Pumice Co.*, 714 F.3d 1197, 1209 (10th Cir. 2013)).

Practical finality is particularly appropriate when an agency may be foreclosed from appellate review. *Id.* at 1318 n.4; *Bender v. Clark*, 744 F.2d 1424, 1428 (10th Cir. 2013). For example, we found the ruling practically final in *Bender v. Clark,* 744 F.3d 1424, 1427–28 (10th Cir. 2013). In *Bender*, a district court remanded after concluding that the Interior Board of Land Appeals had applied the wrong standard of proof. 744 F.2d at 1426. In exercising jurisdiction, we emphasized the importance of applying the correct standard of proof. *Id.* at 1428. Though the issue was important, it was unlikely to return if we did not undertake appellate review. *Id.* So deferring appellate jurisdiction would have threatened our ability to address an important issue involving the standard of proof. *Id.*

Deferring jurisdiction here could similarly threaten our ability to address the Commission's appellate issue involving due process. This issue is serious and important, for due process is an "absolute" and "important" constitutional right. *Carey v. Piphus*, 435 U.S. 247, 266 (1978).

If we were to decline appellate jurisdiction, the Commission's due-process issue would likely escape review in the future. Dismissal of the

8

appeal would spark new administrative proceedings before a new panel, and the resulting order would supersede the Commission's existing order. So any challenge to the district court's ruling on due process would likely become moot, and the Commission would likely lose the chance to appeal.

Reviewing the issue now may also help avoid piecemeal litigation. If we decline review and Zen loses again in administrative proceedings, Zen could again appeal to the district court based on a denial of due process. And if the district court were to rule against Zen, it could appeal. If Zen again appealed, we could invalidate the decision for lack of due process, triggering a new round of litigation. By addressing the due process claim now, we may avoid multiple rounds of litigation.

Given the need for immediate review, we consider the district court's ruling on Commissioner Adler as practically final.

**B.    We lack independent jurisdiction over Zen's cross-appeal.**

Our appellate jurisdiction over the Commission's appeal does not encompass Zen's cross-appeal. So Zen bears the burden of proving appellate jurisdiction over the cross-appeal. *See* pp. 6–7, above. Zen tries to satisfy this burden with three arguments:

1.    We have jurisdiction over the cross-appeal as a matter of practical finality.

2.    We have jurisdiction under the collateral-order doctrine.

3.    The denial of Zen's motion to alter or amend is a final judgment.

9

We reject these arguments.

First, the district court's decision was not "practically final" for Zen. For administrative agencies, a remand prevents a later appeal of the initial decision. *Sierra Club v. U.S. Dep't of Agric.*, 716 F.3d 653, 656–57 (D.C. Cir. 2013). But private parties can freely challenge the initial decision after the agency carries out the remand order. *Id.* So the remand order did not prevent eventual appellate review of Zen's arguments.

Second, the collateral-order doctrine does not apply. Under this doctrine, the collateral issue must be subject to a conclusive determination, be important and separate from the merits of the action, and be effectively unreviewable after a final judgment. *Mesa Oil, Inc. v. United States*, 467 F.3d 1252, 1254 (10th Cir. 2006). Zen argues that it satisfies these requirements with respect to the bias of two Commissioners and the district court's refusal to vacate language constituting an advisory opinion. We disagree.

Even if we decline to exercise jurisdiction over the cross-appeal, Zen could eventually appeal based on the participation of Commissioners Kaye and Robinson. The eventual availability of judicial review prevents reliance on the collateral-order doctrine.

Zen also argues that if this appeal is dismissed, we could never consider whether the district court's discussion on the merits constituted

an advisory opinion. But the district court's ruling hasn't been vacated. So when a final order is eventually issued, Zen could appeal and argue that the merits discussion was advisory. *See* 28 U.S.C. § 1291 (2018).

Third, Zen argues that the denial of its motion to alter or amend constituted a final judgment. But the administrative remand order did not constitute a "final order," *Western Energy All. v. Salazar*, 709 F.3d 1040, 1047 (10th Cir. 1984), so "the denial of a motion to alter such judgment cannot be final for such purposes either," *Branson v. City of Los Angeles*, 912 F.2d 334, 336 (9th Cir. 1990).[2]

Even if the denial of the motion to alter or amend had constituted a final judgment, we would lack appellate jurisdiction over the issue involving an advisory opinion. In Zen's motion to alter or amend the judgment, Zen characterizes the district court's prior assessment of the Commission's decision as an advisory opinion. Even if this assessment constituted an advisory opinion, the district court's prior language did not constitute a judgment, and the entry of judgment is what triggers appellate jurisdiction. *See Jennings v. Stephens*, 574 U.S. 271, 277 (2015) ("This

---

[2] Zen points out that the Ninth Circuit has characterized the denial of a Rule 59(e) motion as an appealable judgment. Second Br. at 12 (quoting *Balla v. Idaho State Bd. of Corrs.*, 869 F.2d 461, 467 (9th Cir. 1989)). But the Ninth Circuit made this characterization while observing that a final judgment is required for a motion under Rule 59(e). *Balla*, 869 F.2d at 467. A judgment is final only if it ends the litigation and leaves only the execution of the judgment. *Catlin v. United States*, 324 U.S. 229, 233 (1945).

11

Court, like all federal appellate courts, does not review lower courts' opinions, but their *judgments*."); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) ("[T]his Court reviews judgments, not opinions.").

**C.    We exercise pendent appellate jurisdiction over Zen's due process claims.**

Although we lack jurisdiction over the cross-appeal, we exercise pendent appellate jurisdiction over Zen's due process claims.

We may exercise pendent appellate jurisdiction over non-appealable decisions "that overlap[] with an appealable decision." *Moore v. City of Wynnewood*, 57 F.3d 924, 929 (10th Cir. 1995). Though pendent appellate jurisdiction is disfavored, it is discretionary. *Id.* We may exercise that discretion when the non-appealable and appealable decisions are "inextricably intertwined." *Id.* at 930. Claims are "inextricably intertwined" when "the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal." *United Transp. Union Loc. 1745 v. City of Albuquerque*, 178 F.3d 1109, 1114 (10th Cir. 1999) (quoting *Moore*, 57 F.3d at 930).

Only Zen's due process claims are intertwined with the Commission's appeal. Zen contends that the district court improperly issued an advisory opinion, but this contention does not bear on the Commission's argument about disqualification of Commissioner Adler.

12

Zen's contentions about Commissioners Robinson and Kaye are different. Zen bases these contentions on the same legal standard and analysis underlying the appeal as to Commissioner Adler's participation. Given this overlap, we exercise pendent appellate jurisdiction over Zen's cross-appeal on the due process issues.

**IV.  The Commissioners did not violate Zen's right to due process.**

Zen argues that it suffered a denial of due process from

- the Commissioners' participation in an adjudication after a related rulemaking and

- the public statements by three Commissioners (Adler, Robinson, and Kaye) showing bias.

We reject both contentions.

**A.  The Commissioners did not violate due process by participating in an adjudication during the related rulemaking.**

Zen admits that agencies can conduct simultaneous rulemakings and adjudications, but insists that the Commission's simultaneous rulemaking and adjudication violated due process in this case. *Compare* Oral Arg. at 31:14–23 ("We are not saying that there's anything inherently wrong with conducting a rulemaking at the same time as undergoing an adjudication."), *with* Second Br. at 21 ("Zen argue[s] that because there was such a high degree of overlap concerning the facts and laws at issue, the Commission *did* necessarily prejudge those matters in advance." (emphasis in original)). In our view, the Commission's simultaneous use of rulemaking and

adjudication did not violate due process. *See* Stephanie W. Kanwit, *Federal Trade Commission* § 1:3 (2019) ("The courts have also generally upheld the commission when it has simultaneously conducted industry-wide investigations and adjudicative proceedings involving the same general subject matter." (footnote omitted)).[3]

Agency officials can undertake multiple roles when carrying out their statutory duties, and the occupation of different roles is not necessarily problematic. For example, administrative officials could participate in an administrative adjudication even after investigating and testifying about their opinions on the underlying conduct. *FTC v. Cement Inst.*, 333 U.S.

---

[3] Although the Commission simultaneously conducted the rulemaking and adjudication, the individual Commissioners did not. In 2012, the Commission proposed the product safety standard and authorized complaint counsel to issue an administrative complaint against the magnet distributors. The Commissioners voted over two years later on approval of the final rule. Roughly two more years passed before the adjudication was appealed to the Commission.

Zen's briefing does not clearly identify whether its due process challenge is based on

- the Commission's simultaneous participation in the proceedings or

- the Commissioners' participation in the adjudication after engagement in the rulemaking.

Despite this ambiguity, either challenge would fail because simultaneous rulemaking and adjudication would not violate due process.

14

683, 700 (1948).[4] And a medical examining board's investigation of a doctor did not preclude the board from later holding a hearing on whether to suspend the doctor's license. *Withrow v. Larkin*, 421 U.S. 35, 46 (1975).

Occupying multiple roles is ordinarily permissible even when an administrative official enters an adjudication familiar with the facts. After all, judges need not ordinarily recuse after ruling on similar issues in other cases involving the same parties. *See Frey v. EPA*, 751 F.3d 461, 472 (7th Cir. 2014) (concluding that the district judge's prior ruling on similar issues in an enforcement action did not require recusal in a citizen suit); *Steering Comm. v. Mead Corp.* (*In re Corrugated Container Antitrust Litig.*), 614 F.2d 958, 964 (5th Cir. 1980) (stating that "overwhelming authority" relieves judges of the need to recuse when presiding over a case involving the same parties and facts even after forming pertinent conclusions in prior cases). Recusal is required only if familiarity with the facts would prevent an administrator from "judging a particular controversy fairly on the basis of its own circumstances." *Hortonville Joint Sch. Dist. No. 1. v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)).

---

[4] Zen points out that in *Cement Institute*, the adjudication addressed whether the defendants had engaged in conduct previously deemed illegal. 333 U.S. at 700. But *Cement Institute* clarifies that agency officials can simultaneously undertake multiple roles in related matters without violating due process. *Id.*

Zen does not show any circumstances suggesting the Commissioners' inability to remain impartial after addressing related issues in the rulemaking. Without such a showing, we conclude that the Commissioners did not deny Zen's right to due process by serving first as rulemakers and then as adjudicators. *See Ash Grove Cement Co. v. FTC*, 577 F.2d 1368, 1373–77 (9th Cir. 1978) (concluding that the FTC's expression of conclusions in an enforcement policy, which resulted from an investigation through rulemaking, did not show prejudgment of related issues in an adjudication).

### B.    The Commissioners' statements do not reflect prejudgment of the issues or a reasonable appearance of prejudgment.

Though agencies may undertake overlapping rulemakings and adjudications, commissioners may still be disqualified for bias if they have "prejudged the case or . . . given a reasonable appearance of having prejudged it." *Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 80 (10th Cir. 1972). But challengers must overcome a presumption that adjudicators are neutral, for we assume that adjudicators are people "of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan*, 313 U.S. 409, 421 (1941); *see* p. 34, below.

To determine whether Zen has overcome this presumption, we consider the context and content of the Commissioners' statements. The

16

context can include a variety of circumstances, including whether the statements

- involved legal or factual issues[5] or

- occurred within the course of performing official duties.[6]

The Commissioners addressed factual issues, and the factual nature of these issues supports Zen. But the parties disagree on whether the statements constituted part of the rulemaking proceedings. Zen contends that the Commissioners made four statements that

- appeared in press releases after the Commission had already voted to approve a proposed version of the eventual rule and

- were made to "commend[] the righteousness of [the Commissioners'] actions."

---

[5] *See* 2 Charles H. Koch, Jr., *Administrative Law & Practice* § 6:10, at 359 (3d ed. 2010) ("Bias as to legal theory or policy cannot be attacked because bias as to policy or theory does not create a defect in the decisionmaking."); Kenneth Culp Davis, *Administrative Law Text* 245 (3d ed. 1972) ("Bias in the sense of crystallized point of view about issues of law or policy is almost universally deemed no ground for disqualification.").

[6] *See* 2 Charles H. Koch, Jr., *Administrative Law & Practice* § 6:10, at 362 (3d ed. 2010) ("Where the potential bias, even as to specific facts, occurs within an institutionalized decisionmaking context, it may be permitted unless it strikes at the very integrity of that process."). These circumstances are not exhaustive. For example, a commissioner's personal stake in the outcome could substantially affect the need for disqualification. *See* 7 Charles H. Koch, Jr., *Federal Administrative Practice* § 8302, at 592 (3d ed. 2001) (stating that "[t]he highest probability" of actual bias comes when the decisionmaker has a personal stake in the outcome).

Second Br. at 24. But the Commissioners made three of these statements in the rulemaking to explain their votes for the rule. The fourth statement was issued by the Department of Justice. In this statement, the Department of Justice included a comment by Commissioner Kaye about a ruling unrelated to the pending adjudication against Zen.

None of the four statements show that the Commissioners prejudged the adjudication or gave a reasonable appearance of prejudgment.[7]

---

[7]     In its reply brief, Zen also relies on another statement by Commissioner Robinson. On May 14, 2014, Commissioner Robinson made a written statement about the Commission's vote to enter into a consent agreement with another firm that had sold high-powered magnet sets. Commissioner Robinson stated that "[h]igh-powered magnets [were] responsible for horrific, long-term, and life threatening injuries in infants and children estimated to be in the thousands." Appellant's App'x, vol. 1, at 268. In a reply brief, Zen criticized the May 14 statement. But in the opening brief, Zen had focused only on two other statements that Commissioner Robinson had made in a separate hearing.

We decline to consider the statement on May 14 because Zen did not challenge this statement in the opening brief. *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1993) ("Appellant failed to raise this issue in his opening brief and, hence, has waived the point."); Third Br. at 1 n.1 (explaining Zen's waiver); Second Br. at 28–29 (quoting Commissioner Robinson's first and second statements but not her third statement).

Zen contends that it preserved this argument because the second brief repeatedly referred to Commissioner Robinson's comment*s*, signaling that all of the comments were involved in the appeal. Fourth Br. at 24. The use of the plural was not enough to alert us to the third statement made on May 14. As noted above, Zen's opening brief had focused on two separate statements that Commissioner Robinson had made in a separate hearing. Without identifying the third statement in the opening brief, Zen failed to preserve this argument.

18

1.    **The three statements made during the rulemaking and one statement made outside the rulemaking do not show prejudgment or its appearance.**

The Commissioners' three statements in the rulemaking do not suggest prejudgment or an appearance of prejudgment. The same is true of Commissioner Kaye's statement outside the rulemaking.

a.    **To determine whether a statement shows prejudgment or its appearance, we consider the statement's context and content.**

The Commission encourages us to approve of each statement made during the rulemaking without considering the content. For example, the Commission contends that "[b]ecause Commissioner Adler was not disqualified from the adjudication by virtue of his participation in the rulemaking, he also was not disqualified by virtue of opinions he appropriately formed and expressed in connection with that rulemaking." First Br. at 16–17.

Zen responds that this argument is unpreserved because the Commission did not make it in district court. We disagree. The Commission raised this argument in district court, though the wording was different.

We generally decline to consider arguments that were not made in district court. We decline consideration even if the appellant makes an argument falling "under the same general category as an argument presented at trial." *McDonald v. Kinder-Morgan, Inc.*, 287

19

F.3d 992, 999 (10th Cir. 2002) (citing *Lyons v. Jefferson Bank & Trust,* 994 F.2d 716, 722 (10th Cir. 1993)). But we focus on the theories that the parties raise, not "the . . . legal rubrics that provide the foundation for them." *Ave. Capital Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 885 (10th Cir. 2016) (quoting *Fish v. Kobach*, 840 F.3d 710, 730 (10th Cir. 2016)).

In framing its argument to our Court, the Commission contends that administrators can adjudicate issues even when they have expressed strong views on the subject. The Commission made the same argument in district court when insisting that Commissioner Adler could participate in both the rulemaking and the adjudication. *See* Appellant's App'x, vol. 2, at 464 ("Time and time again, the Supreme Court has held there is no violation of due process even if officials have already considered similar facts, reached legal conclusions about those facts, and publicly discussed those conclusions."); *id.* at 470 ("Engaging in a Rulemaking and Adjudication Does Not Demonstrate Bias"). The phrasing is new, but the argument is not.

Though the Commission's argument isn't new, it is invalid. Just because a commissioner can participate in both a rulemaking and an adjudication doesn't mean that the commissioner's statements are insulated from scrutiny. To decide whether a commissioner has prejudged the matter or given the appearance of prejudgment, we consider the circumstances. *See Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 80 (10th Cir. 1972). The

20

circumstances include whether the commissioner made the statements while carrying out an official duty.

The Supreme Court addressed this issue in *Federal Trade Commission v. Cement Institute*, 333 U.S. 683 (1948). There the FTC condemned a pricing system before conducting an adjudication against various companies for using this pricing system. 333 U.S. at 700. The Supreme Court held that the right to due process did not prevent the FTC from adjudicating the case after deciding that the pricing system was illegal:

> [No] decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law. In fact, judges frequently try the same case more than once and decide identical issues each time, although these issues involved questions both of law and fact. Certainly, the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court.

*Id.* at 702–03.[8]

We addressed a different situation in *Staton v. Mayes*, 552 F.2d 908 (10th Cir. 1977). There we considered an administrator's comments while

---

[8] Zen argues that *Cement Institute* is distinguishable because the FTC did not "conclude, as a matter of law and fact, that the respondents in that case had engaged in an illegal multiple basing point system." Second Br. at 22. But like the agency in *Cement Institute*, the Commission here confronted different issues in the rulemaking and adjudication. *See* pp. 26–27, 29–30, below.

campaigning for office. 552 F.2d at 913–14. We concluded that the comments showed prejudgment in a later adjudication, and we observed that the administrator had made the statements outside his official capacity. *Id.* at 914 ("These were not mere statements on a policy issue related to the dispute, leaving the decision maker capable of judging a particular controversy fairly on the basis of its own circumstances.").[9]

*Cement Institute* and *Staton* mark opposite sides of the spectrum. Under *Cement Institute*, an administrator can ordinarily participate in an adjudication after opining on disputed issues in the course of other proceedings. After all, judges must often decide issues after squarely deciding the same issues in other proceedings. But *Staton* shows that when an administrator unnecessarily makes prejudicial remarks outside an authorized proceeding, the court is more likely to find a violation of due process.

---

[9]     The D.C. Circuit addressed an analogous issue in *Cinderella Career & Finishing Schools, Inc. v. FTC*. 425 F.2d 583 (D.C. Cir. 1970). There the FTC issued a complaint against a charm school for unfair or deceptive marketing. *Id.* at 584. After the FTC reviewed an administrative law judge's decision, Cinderella moved to disqualify one of the commissioners based on his public statements about Cinderella's advertising. *Id.* at 584–85, 589–90. The D.C. Circuit held that the commissioner's statements showed bias and that he should have been disqualified, emphasizing that the commissioner had made the pertinent comments outside his official duties. *Id.* at 590–91.

22

Under *Cement Institute* and *Staton*, we ask whether administrators made the prior statements in the course of an authorized proceeding. If they did so, we are less likely to consider the prior statements as evidence of prejudgment or its appearance.[10]

But even when statements take place in the course of an authorized proceeding, the statements may reflect prejudgment or its appearance. *See* Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* § 7.7, at 868 (6th ed. 2019) ("It is conceivable that a decisionmaker can form an opinion of a party so extreme that it renders the decisionmaker impermissibly biased, even though the sole source of the facts that form the basis for the opinion is a judicial proceeding in which the decisionmaker presided."). So the court must consider not only the statements' context but also their content.

---

[10] The Commission also refers to *Liteky v. United States*, 510 U.S. 540 (1994). *Liteky* held that 28 U.S.C. § 455(a) requires federal judges and justices to recuse from subsequent judicial proceedings based on statements in previous judicial proceedings only when the statements are "so extreme as to display clear inability to render fair judgment." 510 U.S. at 551. But *Liteky* bears little consequence here; that case relied on the requirements of 28 U.S.C. § 455(a), which arguably differ from the requirements for due process. *See United States v. Couch*, 896 F.2d 78, 81 (5th Cir. 1978) ("[S]ection 455 and the Due Process Clause are not coterminous.").

### b. Commissioner Adler's statement during the rulemaking does not show prejudgment or its appearance.

Commissioner Adler made his statement during the rulemaking when explaining his vote. In the hearing on rulemaking, Commissioner Adler stated that "if these magnet sets remain on the market irrespective of how strong the warnings on the boxes in which they're sold or how narrowly they are marketed to adults, children will continue to be at risk of debilitating harm or death from this product." Appellant's App'x, vol. 2, at 422.

Zen argues that this statement was made in a press release. But this statement is audible in the video recording of the rulemaking proceeding. U.S. Consumer Product Safety Commission, *Commission Meeting: Decisional Matter - Safety Standard for Magnet Sets Final Rule* ["Hearing Video"], YouTube, at 22:20–22:36 (Oct. 2, 2019), https://www.youtube.com/watch?v=nyomlgxgQeU&feature=youtube. The Commission later printed Commissioner Adler's statement and put it on the Commission's website. But Commissioner Adler made this statement in the rulemaking itself, not afterward.

Zen analogizes the statement to comments made following a proceeding when an adjudication is pending on the same issues. The analogy is inapt because Commissioner Adler didn't make the statement after the rulemaking. If a newspaper had printed the comments after the

24

rulemaking, few would characterize the newspaper account as a new statement made outside of the rulemaking. Here the publication appeared on the Commission's website rather than in a newspaper, but this distinction does not give us any reason to treat the statement differently. Because Commissioner Adler made the statement in the rulemaking itself, this factor weighs for the Commission. But this factor does not end the inquiry; we must still consider the content of Commissioner Adler's statement.

The right to due process is violated when a commissioner's remarks demonstrate prejudgment or the appearance of prejudgment. *See* Part IV(B), above. Zen argues that the statement shows Commissioner Adler's predisposition to find the magnets dangerous even with warnings. For three reasons, we disagree.

First, Commissioner Adler was directly addressing an issue before the Commission in the rulemaking: whether the risk could be addressed through alternatives like warnings. *See* 15 U.S.C. § 2058(f)(3) (2018). Commissioner Adler had to decide the issue in order to resolve the rulemaking.

Second, the statement was measured. Commissioner Adler said only that he didn't think that warnings could mitigate the harm. This statement resembles the Commission's explanation for the rule, which casts doubt on the impact of warning labels on the risk of injury. *See* Safety Standard for

25

Magnet Sets, 77 Fed. Reg. 53,781, 53,789 (Sept. 4, 2012). So Commissioner Adler's statements do not show prejudgment or its appearance.

Third, Commissioner Adler clarified that his comments at the hearing did not bear on his judgment in the adjudication. Right after making his statement, Commissioner Adler emphasized that

- he was not "passing judgment on whether magnets present [a substantial product] hazard" for the adjudication because "[he] ha[d] not seen the case before [him]," Hearing Video at 24:38–24:43, and

- "[e]ach type of proceeding carries different factual elements and different standards of proof," *id.* at 25:41–25:46.[11]

Commissioner Adler then repeated these comments in a written statement on the rulemaking, acknowledging "that a product found to present an unreasonable risk of injury" in a rulemaking "might be

---

[11] Zen points out that the district court concluded that the "role of warnings and marketing efforts [had been] of central relevance in the adjudication." Appellant's App'x, vol 1, at 521. But the issues in the rulemaking and adjudication differed. *See* pp. 26–27, 29–30, below.

Zen also argues that Commissioner Adler's statement was extrajudicial because the rulemaking did not address the need to remove the magnets from the market. But Commissioner Adler made the statement

- during the rulemaking

- about issues involved in the rulemaking.

So his statement was not extrajudicial. *See* pp. 24–25, above.

26

completely exonerated as a substantial risk of injury" in an adjudication. Appellant's App'x, vol. 1, at 269.[12]

Given the context and content of Commissioner Adler's statements, we conclude that they did not show prejudgment or the appearance of prejudgment.

### c. Commissioner Robinson's statements during the rulemaking do not show prejudgment or its appearance.

Zen also addresses two of Commissioner Robinson's remarks during the rulemaking:

1. "The problem was however that *however they were marketed* that these were items that were being swallowed by young children and ingested by teenagers and were causing some very, very serious injuries and even deaths."

2. "With the data that we had even though it made a compelling case for this being an unreasonable risk of injury it was understated so the risk was even higher."

Appellant's App'x, vol. 2, at 423 (emphasis in original).[13]

---

[12] Indeed, the Commission used different reasoning in the adjudication and final rulemaking. *See, e.g.*, *id.* at 69 n.28 (noting that in the adjudication, the Commission declined to rely on emergency-room injury reports for injury estimates even though the Commission had relied in the rulemaking on these reports).

[13] Although Commissioner Robinson is no longer on the Commission, her departure does not moot the issue. *See* Second Br. at 25 n.12. If Commissioner Robinson's participation violated Zen's right to due process, her participation would invalidate the Commission's decision because the Court would have no way of knowing whether she had influenced the other

Zen again says that the statements came in a press release. But Commissioner Robinson's statements are recorded in a videotape of the rulemaking as she explained her decision. The first statement came in Commissioner Robinson's opening remarks, Hearing Video at 1:40–1:59; the second statement came when Commissioner Robinson explained her vote for the rule, *id.* at 30:14–30:24.

The Commission later printed Commissioner Robinson's statement and put a written version on the Commission's website. But just like Commissioner Adler, Commissioner Robinson didn't make any new statements for the website; the Commission simply printed the statements that Commissioner Robinson had made during the rulemaking itself. So the context of the statements supports the Commission.

But we must still consider whether the statements' contents show prejudgment or the appearance of prejudgment. The district court answered "no," and we agree.

In her opening remarks, Commissioner Robinson suggested that no *marketing* could mitigate the risk. *See* p. 27, above. But the statement did not show that the Commissioner's mind was closed to the possibility of mitigating the risk through better *instructions*.

two Commissioners' decisions. *See Cinderella Career & Finishing Schs., Inc v. FTC*, 425 F.2d 583, 592 (D.C. Cir. 1970).

28

In her second statement, Commissioner Robinson also distinguished between the standards used in rulemaking and adjudication. The rulemaking required the Commission to make specific findings, including the necessity of eliminating or reducing the risk of injury. 15 U.S.C. § 2058(f)(3) (2018). By contrast, the adjudication required the Commission to decide whether the magnets constituted a "substantial product hazard." 15 U.S.C. § 2064(a) (2018). The term "substantial product hazard" refers to either

- a failure to comply with consumer product safety rules "which creates a substantial risk of injury to the public" or

- "a product defect which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public."

*Id.*

In explaining her vote for the rule, Commissioner Robinson reiterated the elements necessary for rulemaking under 15 U.S.C. § 2058(f)(3). *See* Hearing Video at 27:30–27:38 ("In approaching my decision in this matter, I very much looked carefully at the statutes under which we operate in rulemaking."). Commissioner Robinson noted that the data had "made a compelling case for this being an unreasonable risk of injury" but hadn't shown whether a potential product hazard would have been substantial. *See* Appellant's App'x, vol. 2, at 423. So Commissioner

29

Robinson's statement does not bear on the issue underlying the adjudication.

* * *

Given the context and content of Commission Robinson's statements, we conclude that they do not show prejudgment or the appearance of prejudgment.

### d. Commissioner Kaye's statements (one made during the rulemaking and one made outside the rulemaking) do not show prejudgment or its appearance.

Zen also points to an impassioned statement at the rulemaking by then-Chairman Kaye about the magnets' dangers:

> We all have fears in life. Every single one of us. For me, the biggest without any question, is something tragic happening to one of my boys. Every night, EVERY NIGHT, long after we have put them to bed, I sneak back into their rooms to kiss them one more time. As I do that, I feel tremendous gratitude they are alive and well, and that I am so blessed to have the privilege of hearing in the dark of their rooms the soothing and rhythmic sound of their breathing. I hug them tight, trying not to wake them, all the while knowing that, as long as I might hang on that particular evening, that moment is rather fleeting. And I also know each night that there is certainly no guarantee I will have even one more night to hold onto them tight.
>
> As a parent and as the Chairman of the CPSC, I hurt so much for [AC's] family. I was so deeply moved that [AC's] mother, brothers, grandmother, aunt, and cousin took the time to drive from Ohio to attend the Commission's vote. I will always think of [AC] when it comes to this rule and the action the Commission has approved, and I am so deeply sorry for [AC's] family's loss.

*Id.* at 422 (emphasis in original).

30

Zen again alleges that this statement was made in a press release after the rulemaking. But Commissioner Kaye made this statement in the rulemaking as he explained his vote. Hearing Video at 15:19–16:37. The making of this statement in the rulemaking favors the Commission.

But we must also consider whether the contents of the statement reflect prejudgment or the appearance of prejudgment. Like the district court, we conclude that the statement does not show prejudgment. The statement was passionate, but this passion is not disqualifying. *See United States v. Morgan*, 313 U.S. 409, 421 (1941) (concluding that the Secretary of Agriculture's expression of "strong views" on an issue did not require disqualification from participating in related proceedings). In the same speech, Commissioner Kaye attributed his vote and his remarks to the Commission's mandate to protect consumers. Hearing Video at 9:35–9:43 ("I have not seen a better example of the Commission, in particular CPSC staff, responding and proceeding in a manner true to our mission and purpose.")

Zen argues that Commissioner Kaye's statement went too far and showed "a personal stake in the outcome of both proceedings," demonstrating that he was "removing the Subject Products from the market in order to protect *his own* children." Fourth Br. at 10 (emphasis in original). We disagree. Commissioner Kaye never said that his children had used the magnets. He was simply expressing sympathy for the family

31

of a child who had died from swallowing the magnets. This expression of sympathy did not reflect prejudgment of the issues. *See United States v. Rangel*, 697 F.3d 795, 804–05 (9th Cir. 2012) (holding that a district judge's expression of sympathy for crime victims did not require disqualification from sentencing).[14]

Commissioner Kaye made another statement unrelated to the rulemaking process. In general, comments by adjudicators outside their official duties are not enough, standing alone, to require disqualification. For example, in *Kennecott Copper Corp. v. FTC*, a copper corporation acquired one of the two leading coal corporations in the country. 467 F.2d 67, 69 (10th Cir. 1972). The FTC alleged that this acquisition had violated the Clayton Act. *Id.* The copper corporation argued that it had not received due process because one of the Commissioners had given a public interview using the copper corporation's case as an example. *Id.* at 80. In evaluating the claim, we considered not only the Commissioner's decision to give an interview but also what she had said. *Id.* We concluded that the comments did not infringe the right to due process. *Id.*

Given *Kennecott*, we consider the context of Commissioner Kaye's statement. It was disconnected from the rulemaking but not from his duties

---

[14]    In *Rangel*, the district judge expressed sympathy for the victims after hearing them recount their hardships. 697 F.3d at 804–05. Similarly, Commissioner Kaye expressed sympathy for the child's family after seeing that they had attended the vote for the rulemaking. *See* p. 30, above.

as a Commissioner. In March 2016, a district court enjoined Zen from selling certain rare-earth magnets. Zen had purchased hundreds of thousands of small rare-earth magnets at a discount from another magnet company. One week later, the seller agreed to recall the magnets as part of an agreement with the Commission. Following this agreement, Zen was enjoined from reselling the magnets.

The Department of Justice issued a press release about the injunction and included an official statement by Commissioner Kaye. In the press release, Commissioner Kaye stated:

> Today's decision puts the rule of law and the safety of children above the profits sought by Zen . . . . Far too many children have been rushed into hospital emergency rooms to have multiple, high-powered magnets surgically removed from their stomachs. Young children have suffered infections and one child tragically died from swallowing loose magnets that often look like candy. The ruling is a major victory for the safety of consumers. Our pursuit of this case makes clear we will not tolerate the sale of recalled goods in any form. I am pleased that Judge Arguello ordered Zen to issue refunds to consumers, and I urge anyone who purchased these magnets to immediately seek a refund from Zen.

Appellant's App'x, vol. 1, at 275–76. Zen objects to the accusation that it elevated profit over "the rule of law" and "the safety of children." Second Br. at 30 (quoting Appellant's App'x, vol. 1, at 275).

This statement does not show that Commissioner Kaye prejudged the adjudication. Enforcing the recall order was unrelated to the adjudication. Appellant's App'x, vol. 2, at 524. And Commissioner Kaye was simply

addressing Zen's decision to sell magnets that had been recalled. The statement did not bear on the issue involved in the adjudication (whether unrecalled magnets posed a substantial product hazard).

Commissioner Kaye's comments were also measured. Though Commissioner Kaye lauded the court for prioritizing safety over Zen's profits, the statement focused on the injury from selling magnets that had already been recalled. The message is not enough to overcome the presumption that agency adjudicators are "capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan*, 313 U.S. 409, 421 (1941); *see* p. 16, above. [15]

## V. Conclusion

Because Zen did not suffer a violation of due process from the Commissioners' participation in the adjudication, we

- reverse the district court's exclusion of Commissioner Adler and conclude that his participation in the adjudication did not violate due process and

- affirm the district court's rejection of Zen's challenges to the participation of Commissioners Kaye and Robinson based on bias.

---

[15] Zen also argues that we should exclude the Commissioners from participating in the adjudication because the Commission's chairperson thought that her colleagues had prejudged the issues. But we must make our own independent determination on the issue of due process. We can evaluate the entirety of the Commissioners' statements as they appear in the videotape of the rulemaking. We have no need to defer to a characterization by another participant in the rulemaking.

34