FILED
**United States Court of Appeals**
**Tenth Circuit**

**April 19, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ROCKY MOUNTAIN WILD; SAN LUIS
VALLEY ECOSYSTEM COUNCIL; SAN
JUAN CITIZENS ALLIANCE;
WILDERNESS WORKSHOP,

     Petitioners - Appellees,

v.

DAN DALLAS, in his official capacity as
Forest Supervisor; BRIAN FEREBEE, in
his official capacity as Regional Forester;
ANNE TIMBERMAN, in her official
capacity as Western Colorado Supervisor,
UNITED STATES FOREST SERVICE, a
Federal Agency within the U.S.
Department of Agriculture; U.S. FISH
AND WILDLIFE SERVICE, a federal
agency within the Department of the
Interior.

     Respondents - Appellants,

and

TAMARA WHITTINGTON, in her
official capacity as Deputy Regional
Forester, et al.,

     Respondents.

------------------------------

LEAVELL- MCCOMBS JOINT
VENTURE,

No. 22-1438

Intervenor Respondent.

_____

ROCKY MOUNTAIN WILD; SAN LUIS
VALLEY ECOSYSTEM COUNCIL; SAN
JUAN CITIZENS ALLIANCE;
WILDERNESS WORKSHOP,

　　Petitioners - Appellees,

v.

DAN DALLAS, in his official capacity as
Forest Supervisor; TAMARA
WHITTINGTON, in her official capacity
as Deputy Regional Forester; BRIAN
FEREBEE, in his official capacity as
Regional Forester; UNITED STATES
FOREST SERVICE, a Federal Agency
within the U.S. Department of Agriculture;
ANNE TIMBERMAN, in her official
capacity as Western Colorado Supervisor;
U.S. FISH AND WILDLIFE SERVICE, a
federal agency within the Department of
the Interior,

　　Respondents.

------------------------------

LEAVELL-MCCOMBS JOINT
VENTURE,

　　Intervenor Respondent - Appellant.

No. 22-1439

_____

**Appeals from the United States District Court
for the District of Colorado
(D.C. No. 1:19-CV-01512-CMA)**

_____

Katelin Shugart-Schmidt, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C. (Todd Kim, Assistant Attorney General, with her on the briefs), for Respondents – Appellants.

Aaron D. Van Oort, Faegre Drinker Biddle & Reath LLP, Minneapolis, Minnesota (William Leone, Norton Rose Fulbright US LLP, Denver, Colorado, with him on the briefs), for Intervenor Respondent – Appellant.

Travis E. Stills, Energy & Conservation Law, Durango, Colorado (Matthew Sandler, Rocky Mountain Wild, Denver, Colorado, and Matt Kenna, Public Interest Environmental Law, Durango, Colorado, with him on the brief), for Petitioners – Appellees.

_____

Before **McHUGH**, **EID**, and **ROSSMAN**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

Intervenor Leavell-McCombs Joint Venture ("LMJV")[1] owns a 300-acre parcel of land within the Rio Grande National Forest in Colorado, abutting the Wolf Creek Ski Area ("LMJV Parcel" or "Parcel"). LMJV obtained the Parcel through a land exchange with Appellant U.S. Forest Service ("USFS") in 1987. The LMJV Parcel was encumbered with an easement, placing some restrictions on development ("Scenic Easement"). Development of the LMJV Parcel into a ski resort village was hindered because the Parcel can be reached only by a gravel road managed by the USFS that is unusable by vehicles in the winter.

In 2007, after the Colorado Court of Appeals required LMJV to secure year-round road access to the Parcel before developing it, LMJV invoked the Alaska National

_____

[1] In addition to their definitions in the text, a glossary of acronyms is attached in an Appendix to this opinion.

Interest Lands Conservation Act ("ANILCA"), claiming it requires the USFS to grant access to inholdings within USFS land. The USFS initially proposed a second land exchange with LMJV to secure access to Highway 160, the highway that serves the Wolf Creek Ski Area and is closest to the Parcel. To ensure compliance with the Endangered Species Act ("ESA"), in 2013, the USFS prepared an Environmental Impact Statement ("EIS") and worked with Appellant U.S. Fish and Wildlife Service ("FWS") to secure a biological opinion ("BiOp") and an incidental take statement ("ITS"). In 2015, USFS issued a final Record of Decision ("ROD") and approved the land exchange. Rocky Mountain Wild ("RMW"), San Luis Valley Ecosystem Council, San Juan Citizens Alliance, and Wilderness Workshop (collectively, the "Conservation Groups") challenged this action in the United States District Court for the District of Colorado under the Administrative Procedure Act ("APA"), alleging that it violated the National Environmental Policy Act ("NEPA") and the ESA, among other allegations. In 2017, the district court vacated the USFS decision and remanded to the agency.

The USFS subsequently abandoned the land exchange option and instead considered a new alternative in the form of a right-of-way easement to LMJV across USFS land between the Parcel and Highway 160. The USFS consulted with the FWS to secure a new BiOp and ITS for the proposed action in 2018. The USFS then issued a final ROD in 2019, approving the easement.

The Conservation Groups challenged this latest ROD under NEPA, the ESA, and ANILCA. The district court vacated and remanded under the law of the case doctrine, concluding that it was bound by the reasoning of the district court's 2017 order.

4

According to the district court, the USFS and FWS (collectively, the "Agencies") relied on the same flawed EIS and utilized the same flawed reasoning in the 2018 BiOp and 2019 ROD that the district court previously addressed concerning the 2013 BiOp and the 2015 ROD.

The Agencies appeal the district court's decision vacating the 2018 BiOp and 2019 ROD. At the outset, they argue this court has jurisdiction despite the district court's remand to the agency under the practical finality rule. The Agencies also assert that the district court erred in its application of the law of the case doctrine. As to the merits, the Agencies defend their actions under NEPA and the ESA. LMJV joins as an intervenor in the Agencies' arguments and advances separate arguments defending the Agencies' interpretation of ANILCA and responding to other objections presented to the district court.

The Conservation Groups challenge our subject matter jurisdiction and defend the district court's reasoning under the law of the case doctrine. They further respond that the Agencies' actions were arbitrary and capricious under NEPA and the ESA, and that the USFS improperly extended the reach of ANILCA beyond parcels located in Alaska.

After reviewing the parties' submissions and pertinent authorities, we vacate the district court's order and affirm the Agencies' decisions. We first conclude we have jurisdiction over the matter under the practical finality rule, and that the Conservation Groups have standing. We then hold that the district court incorrectly applied the law of the case doctrine because the Agencies considered a different alternative when

5

issuing the 2019 ROD, and much of the cited reasoning from the district court's 2017 order was either specifically tailored to the land exchange proposal—as opposed to a right-of-way proposal—or was expressed in dicta.

Next, under this court's binding precedent, we conclude ANILCA requires the USFS to grant access to the LMJV Parcel. Further, we determine that even if the Conservation Groups could show error under NEPA, they have not shown that any alleged error was harmful. Finally, we hold that the Conservation Groups fail to successfully challenge the 2018 BiOp under the ESA, and that the Agencies correctly allowed the ITS to cover not only the proposed easement, but also LMJV's proposed development.[2]

---

[2] The Agencies and Conservation Groups also seek permission to file supplemental briefing. In a footnote in their opening brief, the Agencies note that the Conservation Groups presented several substantive NEPA arguments before the district court that the district court did not address. The Agencies then state "[s]hould the Court determine it is in the interest of justice to resolve the remaining issues in this case without a remand, Appellants would submit supplemental briefing in line with the arguments previously presented to the district court." Agencies Br. at 19 n.4. The Conservation Groups respond that they "request the opportunity to fully explore and present the issues set forth in administrative filings and the District Court proceedings," should the court permit supplemental briefing. Response Br. at 87. If we review the 2019 ROD de novo, the Conservation Groups request additional briefing to respond to LMJV's arguments on appeal that they elected not to address in their response brief.

We deny permission to file supplemental briefing. First, Federal Rule of Appellate Procedure 27(a)(1) expressly requires an application for an order or other relief to be made by motion, but the parties have failed to file motions for supplemental briefing. Second, our precedent is clear that:

> [w]hen a district court fails to conduct the requisite plenary review and make necessary factual findings to support the affirmance of agency action, we may either vacate its order and remand for further proceedings

## I.    BACKGROUND

### A.    *Factual History*

In 1986, LMJV's predecessor and USFS prepared to enter a land exchange, in which LMJV would trade 1,631 acres of land for 420 acres of USFS land in the Rio Grande National Forest adjacent to Wolf Creek Ski Area. *Rocky Mountain Wild v. Dallas*, No. 15-cv-01342-RPM, 2017 WL 6350384, at \*1–\*2 (D. Colo. May 19, 2017). The 420 acres USFS offered in the exchange would overlay Highway 160 and facilitate LMJV's development of a ski village adjacent to the Wolf Creek Ski Area. *Id.* at \*1–\*3. USFS reduced the conveyance to 300 acres after finalization of the relevant appraisals, and the parcel became an inholding which could access Highway 160 only by a USFS-managed road closed to "motorized traffic" during the winter. *Id.* The final exchange occurred in 1987. *Id.* at \*1.

---

or we may conduct the necessary review ourselves based on the same administrative record considered by the district court.

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994). The parties have had sufficient notice and opportunity to address the merits of the Conservation Groups' APA challenge and have indeed done so in this appeal.

And to the extent that the Conservation Groups seek development of the record, "[j]udicial review of agency action is normally restricted to the administrative record." *Citizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007). Indeed, "[i]t is only in extremely limited circumstances, such as where the agency ignored relevant factors it should have considered or considered factors left out of the formal record that we will consider extra-record evidence." *Id.* (internal quotation marks omitted). As we now explain, the Conservation Groups make no such showing.

The USFS also imposed the Scenic Easement on the plot conveyed to LMJV, limiting development on the property to residential, commercial, and recreational uses "typical to an all-season resort village." Agencies App. Vol. I at 236. The Scenic Easement dictates the architecture of the structures, the building materials that may be used, and the height of buildings, and prohibits several uses, including feed lots, commercial greenhouses, airports, and permanent hazardous product storage. The Scenic Easement also requires the Supervisor of the Rio Grande National Forest to approve proposed development on the property, which is subject both to waiver by the supervisor and negotiation and arbitration in the event of a disagreement.

Litigation ensued when LMJV attempted to develop the Parcel, ultimately curtailing LMJV's development plans. *Wolf Creek Ski Corp. v. Bd. of Cnty. Comm'rs of Mineral Cnty.*, 170 P.3d 821 (Colo. App. 2007) (affirming the trial court order voiding approval of LMJV's resort development plans). The Colorado Court of Appeals held that state law "require[d] at a minimum year-around wheeled[-]vehicle access between State Highway 160" and the planned development. *Id.* at 830. Because the USFS road "is not usable by wheeled vehicles during the winter," the court held the development plan did not satisfy state law. *Id.*

In 2010, LMJV submitted a land exchange proposal to the USFS and requested that the USFS analyze an access road across USFS lands, invoking the USFS's obligations to provide access to the Parcel to secure "reasonable use and enjoyment thereof" under ANILCA. LMJV App. Vol. IX at 2346. ANILCA directs the USFS to "provide such access to nonfederally owned land within the boundaries of the National

8

Forest System as [it] deems adequate to secure to the owner the reasonable use and enjoyment thereof." 16 U.S.C. § 3210(a). As part of the land exchange proposal, LMJV offered to trade approximately 177 acres of the upland portion of its inholding for 205 acres of USFS's low-lying land that abutted Highway 160. The second alternative was a right-of-way easement approximately 1,612 feet in length and 60 feet in width.

In an effort to comply with NEPA, the USFS prepared and issued a draft EIS for public comment. *See* 42 U.S.C. § 4332(C) (requiring federal agencies to prepare an EIS for "major Federal actions"). The USFS issued its final EIS in 2014. The EIS considered three possible alternatives: the proposed land exchange, the access road easement, or no action. In the "Purpose and Need for Action" chapter of the EIS, the USFS acknowledged that LMJV has a "legal entitlement" to access its property under ANILCA. LMJV App. Vol. IX at 2346, 2348.

The USFS issued its final ROD in 2015 ("2015 ROD"). The 2015 ROD concluded that "access adequate to the reasonable use and enjoyment of the LMJV property" required "automobile access on a snowplowed road." LMJV App. Vol. XII at 3227. The ROD therefore rejected the no-action alternative because it did not meet the USFS's obligation under ANILCA to provide access. The ROD further "conclude[d] that selection of either action alternative would meet" that obligation. *Id.* After reviewing the EIS and "all resource areas," the ROD approved the land exchange because it "provide[d] the greatest opportunity for the [USFS] to improve [its resource] management abilities while meeting [its] legal obligations [under] ANILCA." *Id.* at 3230.

In addition to NEPA, the USFS and LMJV also had to comply with the ESA. Generally, the ESA prohibits the "take" of any endangered or threatened species "within the United States." *See* 16 U.S.C. § 1538(a)(1)(B). Under § 7 and § 10 of the ESA, incidental take may be exempted or permitted. *See id.* §§ 1536(b)(4), 1539(a)(1)(B). Per § 7, federal agencies must consult with the FWS to "insure" that any action taken by the consulting agency "is not likely to jeopardize the continued existence of any endangered [or threatened] species." *Id.* § 1536(a)(2). If, after consultation, the FWS determines that "the taking of an endangered [or threatened] species . . . [is] incidental to the agency action," it can "provide . . . a written statement" exempting the incidental take. *See id.* § 1536(b)(4). Such an exempted take is not "considered to be a prohibited taking" under the statute. *Id.* § 1536(o)(2). Under § 10, when a state or private party, rather than a federal agency, is at risk of taking a species, the FWS "may permit" such action "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." *Id.* § 1539(a)(1)(B).

Regarding the land exchange proposal, the USFS attempted to comply with the ESA by consulting with the FWS and extending incidental take protections to LMJV under § 7, rather than requiring LMJV to undergo the § 10 process to insulate themselves from liability under the ESA. *Rocky Mountain Wild*, 2017 WL 6350384, at *7. Concerning the endangered Canada lynx, the FWS concluded that while the land exchange would result in a slight increase in the number of lynx taken due to increased traffic along Highway 160, the cumulative effects of the land exchange were "not likely to jeopardize the continued existence of [the] lynx." LMJV App. Vol. VIII at 2299. The

10

FWS therefore issued a BiOp and an ITS ("2013 BiOp") exempting a take resulting from the land exchange on the condition that LMJV comply with certain "mandatory reporting and monitoring requirements . . . in order for the take exemption in the [ITS] to be valid." *Id.* at 2303.

## B.    Land Exchange Litigation

Following the FWS's approval of the land exchange, the Conservation Groups filed an action in the United States District Court for the District of Colorado. *Rocky Mountain Wild*, 2017 WL 6350384, at *1. They sought review of the USFS's 2015 ROD under the APA, claiming that the USFS had violated NEPA and the ESA, among other statutes. *Id.* The district court set aside the 2015 ROD on several grounds. *Id.* at *18. First, it found that the USFS's attempt to comply with NEPA violated the APA because the USFS "failed to consider an important aspect of the problem, offered explanations for its decision that run counter to the evidence before the agency, failed to base its decision on consideration of all relevant factors, and was wrong as a matter of law." *Id.* at *11. The district court explained that there was no basis for the USFS to conclude in its EIS and ROD "that the Forest Service had no power or jurisdiction to limit or regulate development on the federal lands being conveyed to LMJV in the present exchange." *Id.* The district court also held that the USFS's Scenic Easement on the property "demonstrates the [USFS's] actual power to control development." *Id.*

Second, the district court determined that the USFS's interpretation of ANILCA was contrary to law. *Id.* The court did not question the USFS's obligation to provide access under ANILCA but disagreed with the USFS's "categorical refusal *to consider*

restrictions on the federal exchange parcel based on ANILCA," rather than applying its land exchange regulations. *Id.* at *12 (emphasis added). The district court explained that "[w]hen a land exchange is selected instead of a proposal under ANILCA, any limitation on [USFS] power to regulate private property to which access is granted under ANILCA is inapplicable." *Id.* Finally, concerning the ESA challenge, the district court concluded that the "conservation measures" imposed "in this case do not meet [statutory] requirements," and as a result, the court held it was "not necessary to decide whether the 'take' authorization [was] legal." *Id.* at *15–*16.

Both the Agencies and LMJV appealed. In response, the Conservation Groups filed a conditional cross-appeal. In 2018, LMJV filed a new "Application for Access," encouraging the USFS to proceed with the access road, or right-of-way, alternative. The Agencies subsequently moved to voluntarily dismiss their appeal, and we granted that motion. *Rocky Mountain Wild v. Dallas*, No. 17-1366, No. 17-1408, No. 17-1413, 2018 WL 11222966 (10th Cir. May 14, 2018). The Conservation Groups then moved to dismiss both LMJV's appeal and its conditional cross-appeal. *Rocky Mountain Wild v. Dallas*, No. 17-1366, 17-1413, 2018 WL 11225766, at *1 (10th Cir. Dec. 11, 2018). We granted the Conservation Groups' motion, concluding that we lacked jurisdiction over the appeal because the USFS engaged in an adjudicatory action in pursuing the land exchange and the district court functionally remanded the matter to the agency, as evidenced in part by the USFS's decision at the time to voluntarily dismiss its appeal and move forward with the access road alternative. *Id.* at *3–*5. We emphasized, however, that "[w]hether [the] USFS ultimately completes the land exchange, builds an access road

across USFS land, or takes some other alternative, it is not free to 'do nothing at all'; it *must* take some action to provide LMJV with access." *Id.* at \*4.

### C.    *Right-of-Way Alternative*

The USFS proceeded with the right-of-way alternative and prepared a Supplemental Information Report ("SIR") to determine whether it needed to prepare a supplemental EIS. The SIR concluded that a supplemental EIS was "not warranted" because "[any] changed conditions and new information would not present a significantly different picture of the environmental effects." Agencies App. Vol. III at 615. The USFS also consulted with the FWS under the ESA concerning the right-of-way, given LMJV's request for coverage under a § 7 ITS and the expected private development which would result from granting the right-of-way.

The FWS issued a new BiOp ("2018 BiOp") concluding that the incidence of Canada lynx killed "will increase by one lynx" due to the right-of-way and the corresponding increase in traffic on Highway 160, but the right-of-way "is not likely to result in jeopardy to the species." *Id.* at 722–23. In comparison with the land exchange proposal, the FWS noted that "[t]he effects of the two actions are similar in severity, duration, and intensity from functional loss of 288–324 acres of Canada lynx habitat and traffic related effects." *Id.* at 693. However, as the FWS explained after reviewing literature on the subject, higher traffic volumes resulting from the development of the LMJV Parcel may reduce the take of lynx because frequent traffic creates a barrier for the species. The FWS also considered three proposed growth models for the anticipated LMJV development in reaching its conclusions. The FWS explained that its analysis

changed from that of prior BiOps because it received updated traffic data from the Colorado Department of Transportation and there had been intervening changes in the surrounding habitat which had led to shifts in the Canada lynx population. The FWS reached these conclusions without considering LMJV's proposed conservation efforts.

The USFS issued a final ROD in 2019 ("2019 ROD"). The 2019 ROD granted LMJV a right-of-way to construct an approximately 1,610-foot-long year-round access road over approximately 3.7 acres of federal land, as well as a 530-foot extension of a preexisting secondary road. The USFS explained that its choice to issue a right-of-way, rather than engage in a land exchange without deed restrictions, "addresses the [district court's] concern that the land exchange alternative gives up existing regulatory authority, while recognizing that [the USFS] cannot compel LMJV to accept *any* deed restrictions." *Id.* at 832.

### D.    *Right-of-Way Litigation*

The Conservation Groups subsequently filed this lawsuit in the District of Colorado in May 2019 and brought fourteen counts challenging the USFS's decision under NEPA, ANILCA, USFS land exchange regulations, the APA, the Federal Records Act, the Freedom of Information Act, the ESA, and the National Forest Management Act. LMJV filed a motion to intervene, which the district court granted on March 31, 2020.

Upon review on the merits, the district court vacated the 2019 ROD and remanded the matter to the USFS. The district court first held that the Conservation Groups have Article III and prudential standing because they submitted declarations showing a concrete and particularized injury that is fairly traceable to the 2019 ROD. The district

court then reasoned that the 2017 district court decision was binding on this matter as law of the case, stating that "[a]side from a new ROD and [BiOp], [the Agencies] rely on a virtually identical administrative record to support the decisions in this case and in the Land Exchange Lawsuit." Agencies App. Vol. I at 176. The district court also held there was no new evidence that would change the court's analysis.

As to the NEPA claims, the district court noted its 2017 holding that the environmental analysis of the EIS was faulty because it was limited to the indirect effects of the proposal development, which in the court's determination was contrary to law and directly contradicted by the USFS's own prior actions concerning LMJV's acquisition and ownership of the private inholding. The district court then explained that the Agencies relied on the same "flawed" EIS in the 2019 ROD, and the reasons set forth in the 2019 ROD were substantially the same as those set forth in the 2015 ROD. *Id.* at 178. The district court also explained that any of the USFS's contentions in the 2019 ROD that it cannot regulate LMJV's private land and development were arbitrary and capricious because they ran contrary to the Scenic Easement, which grants the USFS certain developmental controls.

With respect to the claims under the ESA, the district court concluded that the USFS made the same error in the 2019 ROD that it did in the 2015 ROD by consulting with the FWS regarding LMJV's proposed development under § 7, which concerns the impacts of federal agency action, rather than directing LMJV to consult with the FWS under the more onerous § 10, in determining whether LMJV's development plan would result in a take of the Canada lynx. The district court concluded that, based on prior

15

litigation and its analysis of legislative history, LMJV should not be covered under a § 7 ITS. Finally, the district court noted that the Agencies' internal deliberations concerning whether § 7 or § 10 applies, particularly statements alleging that § 7 was not the obvious pathway for this action, further demonstrated the USFS's improper reliance on that section. The district court concluded that vacatur and remand was the appropriate remedy.

## II.   DISCUSSION

We start by assessing whether we have jurisdiction over this appeal and whether the Conservation Groups have standing to pursue it. Deciding these questions in the affirmative, we then assess the district court's application of the law of the case doctrine. We conclude the district court erroneously applied that doctrine. Finally, we assess the Conservation Groups' APA challenge to the 2019 ROD and 2018 BiOp under ANILCA, NEPA, and the ESA, ultimately affirming the USFS's grant of the right-of-way and the Agencies' extension of the § 7 ITS to cover the LMJV Parcel.

### A.   Jurisdiction

We begin, as we must, by assessing our jurisdiction over this appeal. "[J]urisdiction is a threshold question which an appellate court must resolve before addressing the merits of the matter before it." *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1201 (10th Cir. 2002). "Absent a specific statutory grant of jurisdiction over a particular type of dispute, we exercise jurisdiction over final decisions of the federal

district courts pursuant to 28 U.S.C. § 1291." *W. Energy All. v. Salazar*, 709 F.3d 1040, 1047 (10th Cir. 2013).

Typically, we do not have jurisdiction over an APA action which a district court has remanded to the agency for further proceedings. However, this rule is subject to exception. The Agencies assert that this court has jurisdiction under the practical finality rule, despite the district court's vacatur and remand to the agency. They cite in support of this position the importance and urgency of the issue, the fact that the deciding agency is filing the appeal, and the application of our balancing test.[3] We agree and exercise jurisdiction over this appeal.[4] We further hold that the Conservation Groups have standing to pursue it.

---

[3] The Conservation Groups make several arguments asserting that this court lacks jurisdiction over this matter. However, with minimal support, their argument primarily consists of challenging the appellants' ability to appeal this matter on account of their alleged failure to adhere to the 2017 district court order. But they conflate the law of the case doctrine with appellate jurisdiction, as reflected in their citations to circuit precedent addressing the law of the case doctrine in support of their jurisdictional argument. The Conservation Groups also cite to past actions between LMJV and the USFS to support their jurisdictional argument, although those actions are not before this court and are not incorporated into either of the district court opinions referenced here. Their jurisdictional arguments are therefore unpersuasive.

[4] LMJV asserts that this court has pendant appellate jurisdiction over its appeal "because both appeals arise from the same district court order and address the same underlying access decision," and because their rights will be adjudicated by this court in conjunction with the Agencies' appeal. LMJV Br. at 3. This is correct. Only the Agencies may undertake action granting LMJV access to their properties, and only the Agencies can independently obtain appellate jurisdiction in this matter under the practical finality exception to the administrative remand rule. *See Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 968 F.3d 1156, 1166–67 (10th Cir. 2020) ("We may exercise that discretion [to exercise pendant appellate jurisdiction] when the

1.    **Administrative Remand Rule**

"The remand by a district court to an administrative agency for further proceedings is ordinarily not appealable because it is not a final decision." *Bender v. Clark*, 744 F.2d 1424, 1426–27 (10th Cir. 1984); *see also N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 19 (D.C. Cir. 2008) ("It is black letter law that a district court's remand order is not normally 'final' for purposes of appeal under 28 U.S.C. § 1291."). "The purpose of the finality requirement is to avoid piecemeal review." *Bender*, 744 F.2d at 1426. The general principle that appellate courts do not address issues pending before an agency is called the administrative remand rule. *W. Energy All.*, 709 F.3d at 1047.

In determining whether the administrative remand rule applies, we must first decide if a remand occurred, meaning "[we] must consider the nature of the agency action as well as the nature of the district court's order." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 697 (10th Cir. 2009). Normally, a remand "occurs when an agency has acted in an adjudicative capacity," meaning "[a] party to the adjudication appeals the agency's determination to a district court, and the district court instructs the agency to conduct further proceedings." *Id.* Here, the district court explicitly remanded the action to the agency to conduct further proceedings, leaving us to decide only whether the agency action was adjudicative in nature.

---

non-appealable and appealable decisions are inextricably intertwined, [meaning] the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal." (internal quotation marks omitted)).

Much like the USFS's 2015 ROD, which we held was adjudicative because it impacted the rights of LMJV, the USFS's 2019 ROD was adjudicative. *See Rocky Mountain Wild*, 2018 WL 11225766, at *4. Agency action that "'settles the rights of specific parties,' like permitting or 'making a determination on a particular entity's lease application,' is adjudicative." *Id.* (quoting *W. Energy All.*, 709 F.3d at 1047–48). Here, the USFS made a determination on an application—the inholding access application— and settled the rights of a specific party, LMJV. Furthermore, the proposed right-of-way would connect a private plot of land to a public roadway, rather than, for instance, provide public access to a broader section of USFS land. Accordingly, we conclude the USFS's approval of LMJV's access application was adjudicative. *See W. Energy All.*, 709 F.3d at 1047; *contra Richardson*, 565 F.3d at 697–98 (concluding that a Bureau of Land Management ("BLM") regulation that was broadly applicable was legislative in nature). As the USFS's 2019 ROD, and the 2018 BiOp through incorporation, were both adjudicative and remanded to the agency, the administrative remand rule applies.

## 2.    Practical Finality Rule

Because the district court's order is subject to the administrative remand rule, the next step is to determine whether an exception to the rule applies. "We have recognized three exceptions to the administrative remand rule: (1) the collateral order doctrine, (2) the practical finality rule, and (3) the pendent appellate jurisdiction doctrine." *C.W. by & through B.W. v. Denver Cnty. Sch. Dist. No. 1*, 994 F.3d 1215, 1221 (10th Cir. 2021). The Agencies assert that this court has jurisdiction over the district court's order under the practical finality rule. We agree.

19

"A district court's remand is practically final when it is urgent that an issue be decided because it is important, serious, and unsettled." *Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 968 F.3d 1156, 1164–65 (10th Cir. 2020). "In practice, we have applied the practical finality rule to review important legal questions which a remand may make effectively unreviewable." *C.W.*, 994 F.3d at 1221 (internal quotation marks omitted). "To decide whether a decision is practically final, we ask whether the danger of injustice by delaying appellate review outweighs the inconvenience and costs of piecemeal review." *Zen Magnets*, 968 F.3d at 1165 (internal quotation marks omitted).

"Practical finality is particularly appropriate when an agency may be foreclosed from appellate review," *id.*, because "once [an] agency completes its remand proceedings, the government, unlike a private litigant, typically has no avenue for obtaining judicial review of its own administrative decisions," *C.W.*, 994 F.3d at 1221 (internal quotation marks omitted). This stems from the fact that "[a]fter a district court remands to an agency for further proceedings, the agency must conform its proceedings to the remand order." *Id.* "Consequently, if a district court remands an issue to an administrative agency and essentially instructs the agency to rule in favor of the plaintiff, the agency may well be foreclosed from again appealing the district court's determination at any later stage of the proceeding." *Rekstad v. First Bank Sys., Inc.*, 238 F.3d 1259, 1262 (10th Cir. 2001) (internal quotation marks omitted); *see, e.g.*, *Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1152 (10th Cir. 2019) (concluding that a remand order was appealable under the practical finality rule when it prevented the Bureau of Indian Affairs from placing a parcel of land into trust for the benefit of a band of Cherokee Indians

20

without the consent of the Cherokee Nation, thereby blocking any further agency action without the Cherokee Nation's consent); *Ausmus v. Perdue*, 908 F.3d 1248, 1252 (10th Cir. 2018) (applying the practical finality rule when an agency was directed to implement a particular outcome rather than recommence a proceeding).

"[W]e employ a two-pronged test for applying the practical finality rule: the issue must be 'important' and it must be 'urgent.'" *W. Energy All.*, 709 F.3d at 1049–50. "If the test is met, we then follow a balancing approach[,]" with the "critical inquiry" being "whether the danger of injustice by delaying appellate review outweighs the inconvenience and costs of piecemeal review." *Id.* at 1050 (internal quotation marks omitted). "As a general matter, if additional proceedings in a district court are contemplated after remand to an agency [for example, when counts of a complaint remain pending before the district court,] we think the better rule is for the government to wait until a final judgment is entered." *Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1140 (10th Cir. 2011).

Here, both the importance prong and urgency prong are readily met because the Agencies would be required to comply with the district court's analysis of important issues under NEPA and the ESA without review by this court. *Cf. W. Energy All.*, 709 F.3d at 1050 ("[W]e review orders to remand a matter to an administrative agency when it is necessary to ensure that we can review important legal questions which a remand may make effectively unreviewable, because administrative agencies may be barred from seeking [judicial] review of their own administrative decisions." (quotation marks omitted)). And if the Agencies were to make the changes to the analysis directed by the

21

district court, they would likely have no opportunity to return to the district court to contest those required changes. While undertaking the analysis prescribed by the district court could lead to litigation by LMJV against the Agencies, which might resurrect these issues, we have previously held that speculative future litigation does not preclude an agency from seeking review of its own actions under the practical finality doctrine. *Bender*, 744 F.2d at 1428.

We also conclude "the danger of injustice by delaying appellate review outweighs the inconvenience and costs of piecemeal review." *See Miami Tribe of Okla.*, 656 F.3d at 1140 (quotation marks omitted). First, there are no other aspects of this litigation pending before the district court. *See id.* Second, the district court's actions have precluded the Agencies from providing LMJV access to the Parcel, contrary to this court's order in 2018 stating, "Whether USFS ultimately completes the land exchange, builds an access road across USFS land, or takes some other alternative, it is not free to 'do nothing at all'; it *must take some action to provide LMJV with access.*" *Rocky Mountain Wild*, 2018 WL 11225766, at \*4. Where LMJV and its predecessor have been attempting to obtain access to the Parcel since 1987, this is an urgent and important issue. *See Trout Unlimited v. U.S. Dep't of Agric.*, 441 F.3d 1214, 1219 (10th Cir. 2006) (jurisdiction contrary to the administrative remand rule may be appropriate when "delay in review . . . would likely result in further disputes and litigation, confusion and danger of injustice" (quotation marks omitted)).

The Conservation Groups point to the Agencies' failure to appeal the district court's 2017 order and their alleged rebuke of the district court's reasoning as precluding

their ability to appeal the district court's 2022 order. But as the Agencies correctly explain in reply, this response does not engage with the practical finality exception to the administrative remand rule. Instead, the Conservation Groups conflate the law of the case doctrine with the scope of our subject matter jurisdiction. The Conservation Groups also argue that allowing this appeal to proceed would "improperly alter the finality of the [government's] decision [not to approve the Agencies desire to appeal the 2017 district court decision] that obligated the Agencies to conform with [that] order on remand." Response Br. at 74. However, this argument concerns the merits of the appeal, rather than our jurisdiction. This is because responding to this contention necessarily involves review of whether the Agencies undertook a new NEPA review and whether they acted arbitrarily and capriciously in approving a different alternative in the 2019 ROD. For purposes of assessing our subject matter jurisdiction, we consider only "whether the danger of injustice by delaying appellate review outweighs the inconvenience and costs of piecemeal review." *Zen Magnets*, 968 F.3d at 1165 (internal quotation marks omitted).

We conclude that the danger of injustice in delaying appellate review here outweighs the costs of piecemeal review. Accordingly, we have jurisdiction over this appeal under the practical finality rule.

### 3.    Standing

While neither the Agencies nor LMJV contest standing, the Conservation Groups reassert their standing arguments before this court.[5] "Standing . . . raises jurisdictional questions and we are required to consider the issue *sua sponte* to ensure that there is an Article III case or controversy before us." *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 942 (10th Cir. 2003) (internal quotation marks omitted). All four Conservation Groups have standing to proceed with this litigation.

Article III of the United States Constitution limits federal jurisdiction to cases and controversies. U.S. Const. art. III. The Supreme Court has interpreted this to mean parties must have standing to bring cases in federal courts. To establish standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

---

[5] The Conservation Groups also assert in a footnote that LMJV and the Agencies do not argue that they have standing to bring this appeal. But "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The Conservation Groups brought this suit from the outset. Accordingly, they bear the burden to establish their standing to pursue the action.

In any event, because the Agencies are aggrieved by the ruling of the district court, they have standing to bring this appeal. *Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1137 (10th Cir. 2011). And because LMJV does not seek any additional relief beyond that sought by the Agencies, it has standing to intervene in this appeal. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right. Thus, at the least, an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests.").

speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). An organization has standing if it can show at least one of its members meets the requirements for Article III standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

When it comes to environmental litigation, if the alleged "harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). "In the context of a NEPA claim, the harm itself need not be immediate, as the federal project complained of may not affect the concrete interest for several years." *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002) (internal quotation marks omitted). Furthermore, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for the purpose of standing." *S. Utah Wilderness All. v. Off. of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1233 (10th Cir. 2010) (quoting *Lujan,* 504 U.S. at 562–63).

Several affidavits before us demonstrate standing for three of the Conservation Groups. For one, Jimbo Buickerood, a member and employee of the San Juan Citizens Alliance, discusses his frequent trips to Wolf Creek Pass for recreation and how the LMJV development would impact his recreational, spiritual, and esthetic enjoyment of the area. Christine Canaly, the Director of the San Luis Valley Ecosystem Council, discusses how the organization's members rely on groundwater, which will be impacted by the development, and also attests that members recreate in the surrounding National

25

Forest. Tehri Parker, the Executive Director of RMW, and Paige Singer, a Conservation Biologist and Geographic Information Systems Specialist for RMW, frequently recreate in the area surrounding the site of the proposed development, and Ms. Singer personally and academically observes the Canada lynx and is therefore concerned about how the project will impact them. There is no dispute that the right-of-way would change traffic patterns surrounding the Wolf Creek Ski Area and would also lead to new development activities, changing the esthetic nature of the Rio Grande National Forest and affecting the Canada lynx population in the area. Each affidavit shows that at least one member of the aforenamed organizations has recreational and esthetic interests which would be affected if the right-of-way grant proceeds. These affidavits support standing for the San Juan Citizens Alliance, the San Luis Valley Ecosystem Council, and RMW.

There are no affidavits supporting Wilderness Workshop's standing. So long as it does not seek any further relief than the other Conservation Groups who have independently established standing, however, it may remain a party to the litigation. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("For all relief sought, there must be *a* litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." (emphasis added)). Wilderness Workshop does not seek any relief in addition to that sought by the other Conservation Groups. Accordingly, the Conservation Groups all have standing to litigate this appeal.

### B.      *Law of the Case Doctrine*

We next review the propriety of the district court's reliance on the law of the case doctrine in remanding the 2019 ROD to the USFS. The district court reasoned the law of

the case doctrine controls the outcome here because the 2019 ROD relied on the same

"flawed" EIS as the 2015 ROD, and the ESA analysis underlying the 2018 BiOp is

similar to the ESA analysis underlying the 2013 BiOp. But the district court overlooked

the fact that the 2019 ROD considered a new alternative, the underlying reasoning of

which transcends the scope of the district court's holdings in 2017. Accordingly, the law

of the case doctrine is inapplicable to this matter.[6]

"The law of the case doctrine provides, when a court rules on an issue of law, the

ruling should continue to govern the same issues in subsequent stages in the same case."

*Vehicle Mkt. Rsch., Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1256 (10th Cir. 2016)

(internal quotation marks omitted). "This principle applies to all issues previously

decided, either explicitly or by necessary implication." *Id.* (internal quotation marks

omitted); *see also Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th

---

[6] This court would not be bound by the district court's application of the law of the case doctrine in any event. *See, e.g.*, *Woodruff v. Herrera*, 623 F.3d 1103, 1113 (10th Cir. 2010) ("[T]his court is not bound by the law of the case set in district court."); *In re Woods*, 173 F.3d 770, 776 (10th Cir. 1999) ("So long as a matter is properly preserved in [a] lower court, the fact that the lower court can properly refuse reconsideration as a matter of law of the case of course does not prevent subsequent review . . . on appeal." (quoting 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478, at 801 (1981)) (alteration in original)). Because the parties' briefing and district court's reasoning suggest there is confusion over the applicability of the law of the case doctrine in complex administrative appeals with multiple remand orders, we address this issue to clarify the doctrine's application.

Additionally, the Conservation Groups seek a remand if the panel concludes that the district court improperly applied the law of the case doctrine. This is unnecessary, however, because we may review an APA challenge de novo, and the parties have argued the merits of the 2019 ROD on appeal. *Olenhouse*, 42 F.3d at 1580. Like this court did in *Olenhouse*, "[h]aving already obtained and reviewed the administrative record in this case, we choose the latter course." *Id.*

Cir. 2016) ("Law of the case doctrine [precludes] the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court."). The law of the case doctrine also "require[s] the administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart." *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002) (quoting *Wilder v. Apfel,* 153 F.3d 799, 803 (7th Cir. 1998)). "Whether a prior decision constitutes law of the case is a legal issue that we review de novo." *Stewart v. Beach*, 701 F.3d 1322, 1329 (10th Cir. 2012). However, "the decision whether to apply [the] law of the case doctrine remains a matter of judicial discretion." *Entek GRB*, 840 F.3d at 1242.

We first hold that the Agencies approved a significantly different action alternative here in the form of a right-of-way, rather than a land exchange. To be sure, they relied on the same EIS that was challenged before the district court in 2017, but they did so after preparing an SIR, which determined that a new EIS was not warranted because any "changed conditions and new information would not present a significantly different picture of the environmental effects." Agencies App. Vol. III at 615. Further, the Agencies included in the 2019 ROD a new BiOp that noted changes in the relevant data since it issued its land exchange BiOp in 2013.

The Supreme Court has explained that district courts are permitted to remand agency actions to either provide "a fuller explanation of the agency's reasoning at the time of the agency action" or to take new agency action. *Biden v. Texas*, 597 U.S. 785, 808 (2022) (quoting *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891,

28

1907 (2020)). For instance, in *Biden*, when the Secretary of Homeland Security was seeking to end the Migrant Protection Protocols program, the Secretary issued a new memorandum on remand that officially superseded the memorandum a district court had vacated and that provided several new reasons, absent from the original memorandum, justifying termination of the program and squarely addressing issues that the district court believed were insufficiently addressed. *Id.* The Court reasoned that this action was properly considered to be a new agency action. *Id.* Similarly, here, the USFS explained that after the district court vacated the 2015 ROD, "the United States decided to pursue a new decision and dismissed its appeal." Agencies App. Vol. III at 829.

The district court acknowledged that the USFS undertook a new agency action but took issue with its continued reliance on the same EIS. The district court's analysis overlooks that "[i]t is black-letter law that an agency that takes superseding action on remand is entitled to 'reexamine[] the problem, recast its rationale and reach[] the same result.'" *Biden*, 597 U.S. at 813 (second and third alterations in original) (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). The USFS abandoned the land exchange proposal and instead considered a right-of-way easement to secure access to the LMJV Parcel. In doing so, the USFS reexamined the problem in light of the district court's 2017 decision and reached a different conclusion about the preferred alternative. Although it relied on a similar agency record, the USFS completed an SIR that concluded a new EIS was not required, obtained a new BiOp examining the impacts of the right-of-way alternative on the endangered lynx, and entertained additional public comment.

Furthermore, the district court's analysis overlooks the narrow scope of the district court's review of the EIS in its 2017 order. There, the district court held there was no basis for the USFS to conclude in its EIS and 2015 ROD "that the Forest Service had no power or jurisdiction to limit or regulate development on the federal lands being conveyed to LMJV in the present exchange." *Rocky Mountain Wild*, 2017 WL 6350384, at *11. The district court concluded such authority could be found in the USFS's Scenic Easement on the Parcel because it gave the USFS "actual power to control development." *Id.* But the district court reached that conclusion based on its reading of the land exchange regulations as requiring agencies to reserve certain rights to ensure the public interest is protected. *Id.* Critically, a core failing of the land exchange according to the district court was its failure to extend the Scenic Easement to the land to be conveyed under the 2015 ROD. *Id.* The district court highlighted that "neither the [EIS] nor the ROD provide the reasoning or public interest analysis for failing to consider conditioning the land exchange on extension of the Scenic Easement to the federal lands being conveyed, or taking other restrictive steps." *Id.* These statements taken together show that the district court's 2017 decision and underlying reasoning regarding the EIS's and the 2015 ROD's NEPA analysis primarily concern the unique challenges presented by a land exchange, rather than a right-of-way.

The district court's application of the law of the case doctrine is further undermined because the analysis in the 2018 BiOp used in the 2019 ROD is distinguishable from the analysis in the 2013 BiOp incorporated into the 2015 ROD. The 2018 BiOp relies on different metrics than the 2013 BiOp and, unlike the 2013 BiOp, did

30

not predicate its conclusion on LMJV's conservation proposals. Critically, the district court in 2017 rejected the USFS's analysis of the ESA impacts because it was based only on the proposed conservation measures in the 2013 BiOp. *Id.* at \*13–\*16. The ESA analysis challenged in this lawsuit is different than that advanced in the 2017 proceedings. Indeed, the 2018 BiOp expressly excludes LMJV's proposed conservation measures from its analysis. Here, the criticism of the USFS's treatment of the ESA is focused on the propriety of the Agencies and LMJV relying upon § 7 of the ESA rather than § 10. And while the district court in 2017 opined on the propriety of extending a § 7 ITS to cover LMJV's proposed development, it explicitly stated that "[i]t is not necessary to decide whether the 'take' authorization is legal." *Id.* at \*14–\*15. "[D]icta is not subject to the law of the case doctrine." *Bay v. Anadarko E&P Onshore LLC*, 73 F.4th 1207, 1216 (10th Cir. 2023) (quotation marks omitted).

Accordingly, the district court erred in its application of the law of the case doctrine to this matter.

### C.       APA Standard of Review

We review a district court's resolution of APA claims de novo, applying the same deferential standard toward the agency's decisions that the district court applies. *Biodiversity Conserv. All. v. Jiron*, 762 F.3d 1036, 1059 (10th Cir. 2014); *Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). We will not overturn an agency's decision "unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law.'" *Utah Env't Cong.*, 443 F.3d at 739 (quoting 5 U.S.C. § 706(2)(A)). Additionally, an agency's violation of the APA "does not require reversal

31

unless the appellant demonstrates prejudice resulting from the error." *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1183 (10th Cir. 2013). "We may set aside agency action only for substantial procedural or substantive reasons." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 779 (10th Cir. 2006) (internal quotation marks omitted).

"[T]he burden is on the petitioner to demonstrate that the action is arbitrary and capricious." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (quotation marks omitted). To avoid a finding that an agency action is arbitrary and capricious, "the agency cannot (1) rely on factors deemed irrelevant by Congress; (2) fail to consider important aspects of [the] problem; (3) present an explanation that is either implausible or contrary to the evidence or (4) reach a decision that is not supported by substantial evidence in the [administrative] record." *Am. Petroleum Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1058 (10th Cir. 2023) (internal quotation marks omitted) (alterations in original). "We do not 'substitute [our] judgment for that of the agency,' and we do not 'supply a reasoned basis for the agency's action that the agency itself has not given.'" *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793–94 (10th Cir. 2010) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Nevertheless, "we also accord agency action a presumption of validity." *Wyoming*, 661 F.3d at 1227 (internal quotation marks omitted). "If the agency's 'path may reasonably be discerned' from its explanation, we will not disturb the action even when the explanation is not entirely clear." *WildEarth Guardians v. U.S. E.P.A.*, 770 F.3d 919,

927 (10th Cir. 2014) (quoting *Alaska Dep't of Env't Conservation v. E.P.A.,* 540 U.S. 461, 497 (2004)).

### D.        ANILCA

In our merits review of this matter, we first address the Conservation Groups' challenge to the USFS's understanding of ANILCA, 16 U.S.C. § 3210(a), as requiring it to grant access to the LMJV Parcel. The Conservation Groups argue that the plain language of the statutory framework does not extend ANILCA § 3210(a)'s coverage to land outside of Alaska.[7] Although the Conservation Groups raise cogent arguments and the parties extensively discuss this issue in their briefing before this court, our precedent

---

[7] The Conservation Groups further argue that the Agencies are improperly granting rights-of-way to utilities for LMJV's development. They cite to 36 C.F.R. § 251.111, which explains that under the regulatory subpart governing "Access to Non-Federal Lands," Part 251, Subpart D, "[a]ccess means the ability of landowners to have ingress and egress to their lands. It does not include rights-of-way for power lines or other utilities." This regulatory subpart "set[s] forth the procedures by which landowners may apply for access across National Forest System lands and the terms and conditions that govern any special use or other authorization that is issued by the [USFS] to permit such access." 36 C.F.R. § 241.110(a). It also contains three sections outlining the requirements for applications, the instruments of authorization, and the criteria, terms, and conditions for access. *See* 36 C.F.R. § 251.112–114. None of these three regulatory sections contains language prohibiting a grant of access that includes utilities. Instead, the use of "access" in these sections suggests that there is no obligation for the grant of a right-of-way to include utility easements. *See, e.g.*, 36 C.F.R. § 251.114 (g) (listing factors the USFS must consider in authorizing access under ANILCA, which focus on means of ingress and egress). But there is no language in ANILCA limiting the extent of rights which may be conveyed in a right-of-way. We therefore see no basis to conclude that extending other rights-of-way, including for utilities serving a future development on the Parcel, is impermissible under the statute.

reads § 3210(a) as extending to National Forest inholdings outside of Alaska. Therefore, we are bound to mandate that the USFS grant LMJV access to the Parcel.

"Our primary task in construing statutes is to determine congressional intent, using traditional tools of statutory interpretation." *S. Furniture Leasing, Inc. v. YRC, Inc.*, 989 F.3d 1141, 1146 (10th Cir. 2021) (quotation marks omitted). "When interpreting a statute, we begin by examining the statute's plain language, and if the statutory language is clear, our analysis ordinarily ends." *Seale v. Peacock*, 32 F.4th 1011, 1024 (10th Cir. 2022) (internal quotation marks omitted). "[Tools of statutory interpretation] include examination of the statute's text, structure, purpose, history, and relationship to other statutes." *Am. Fed'n of Gov't Emps., Loc. 1592 v. Fed. Lab. Rels. Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016). When a term is undefined in a statute, we must look to its ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). "Dictionary definitions are useful touchstones to determine the 'ordinary meaning' of an undefined statutory term." *In re Mallo*, 774 F.3d 1313, 1321 (10th Cir. 2014).

Section 3210(a) of ANILCA states in relevant part:

> **Reasonable use and enjoyment of land within boundaries of National Forest System**
>
> Notwithstanding any other provision of law, and subject to such terms and conditions as the Secretary of Agriculture may prescribe, the Secretary shall provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof[.] . . . .

The Conservation Groups argue that the plain language of the statute contains no express reference to lands outside of Alaska. To the contrary, LMJV and the Agencies

34

contend the statute contains no language expressly limiting the section's applicability to Alaska. Furthermore, the Agencies are correct that the statute does not include a definition, let alone an Alaska-specific definition, for "the National Forest System" or "National Forest System lands." 16 U.S.C. § 3102. Turning to the dictionary, the adjective "national" is defined as "of a nation, common to a whole nation," thereby suggesting a broader reach than a single state. *National*, Oxford American Dictionary (Oxford University Press 1980). Had the statute specifically referenced National Forest System lands in Alaska, we would be bound to adhere to this geographic modifier. But no such language exists in ANILCA.

The Conservation Groups counter, however, that § 3210(a) of ANILCA is expressly limited to National Forest Service Land in Alaska because it is part of a broader statutory framework titled the Alaska National Interest Lands Conservation Act. They also assert that the Supreme Court has limited applicability of other sections of ANILCA to Alaska, and that the Congressional Statement of Purpose makes repeated mention of preserving land, water, and the economic and subsistence needs of Alaska. 16 U.S.C. § 3101. For example, part (b) of § 3210 is constrained to "nonfederally owned land surrounded by public lands," *id.* § 3210(b), which are by definition "situated in Alaska," *id.* § 3102(3). But part (a) is not so constrained, lending some support for an interpretation applying § 3210(a) broadly to the entire "National Forest System" as defined in § 1609(a).

To be sure, the parties have raised competing interpretations concerning the reach of ANILCA. We need not resolve this issue in the first instance, however, because we are

35

bound by circuit precedent. In 1994, we held in *United States v. Jenks* that "[§] 3210(a) of ANILCA guarantees to inholders a threshold 'right of access to their lands subject to reasonable regulation [under FLPMA] by . . . the Secretary of Agriculture in the case of national forest [lands].'" 22 F.3d 1513, 1516 (10th Cir. 1994) (second and third alterations in original) (quoting *Adams v. United States,* 3 F.3d 1254, 1258–59 (9th Cir. 1993)). Relying upon post-enactment legislative history discussed in a 1980 House of Representatives report and adopting the view of the Ninth Circuit, we concluded that "[§] 3210(a) of ANILCA applies to all National Forest System lands." *Id.* at 1516 n.3. There, we held ANILCA guaranteed access to the defendant's inholdings located in Apache National Forest in Catron County, New Mexico. *Id.* at 1516. Thus, we have binding precedent interpreting ANILCA's reach as nationwide.

The Conservation Groups attempt to overcome this hurdle by pointing to the Supreme Court's disfavor of post-enactment legislative history. But "[w]e cannot overrule the judgment of another panel of this court. We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *United States v. Manzanares*, 956 F.3d 1220, 1225 (10th Cir. 2020) (quotation marks omitted) (alteration in original).

It is true the Supreme Court disfavors reliance on post-enactment legislative history, *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011), and has asserted a preference for plain language interpretation when possible, *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 673–75 (2020). But the Supreme Court has never explicitly forbidden reliance upon post-enactment legislative history. Nor has the Supreme Court

held that the applicability of § 3210(a) is limited to Alaska. While the Court has explained, looking at ANILCA as a whole, "the Act contemplates the possibility that all the land within the boundaries of conservation system units in Alaska may be treated differently from federally managed preservation areas across the country," *Sturgeon v. Frost*, 577 U.S. 424, 440–41 (2016), this does not squarely address the plain language of § 3210(a) or hold it is so limited. As a result, it is insufficient to override our past precedent.[8] *See Manzanares*, 956 F.3d at 1225. We therefore affirm the USFS's reliance on ANILCA in granting access to LMJV.

### E.      NEPA

We next address the Conservation Groups' challenge to the 2019 ROD under NEPA. They claim that the 2019 ROD improperly fails to classify LMJV's development proposal as part of a federal action, while also alternatively arguing that the 2019 ROD erred by not considering the development proposal as a direct effect of the federal action. They also assert that the USFS improperly declined to work with cooperating agencies in

---

[8] The Conservation Groups also argue that the canon favoring a sovereign grantor when there is ambiguity in a land grant supports their reading of ANILCA. However, the cases they cite involve disputes between the government and the grantee over the scope of a land grant already conveyed. *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 37–38 (1983); *Great N. R. Co. v. United States*, 315 U.S. 262, 270 (1942). Here, there is no dispute over the scope of the proposed right-of-way, and furthermore, the right-of-way conveyance being challenged has yet to occur.

preparing the underlying EIS. Upon review of these arguments and of the agency record, we conclude there are no violations of NEPA warranting vacatur.[9]

1.    **NEPA Overview**

NEPA is a federal environmental law that requires agencies to consider the environmental impacts of their actions as part of the decision-making process and to inform the public about these impacts. *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1021 (10th Cir. 2002). "NEPA does not create a cause of action, so NEPA challenges are brought under the APA." *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1029 (10th Cir. 2023). NEPA does not require any particular outcome, and it does not require agencies to give special weight to environmental concerns. *Citizens' Comm. to Save Our Canyons,* 297 F.3d at 1022. "[I]t requires only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Id.* (quotation marks omitted). To that end, NEPA requires

---

[9] The Conservation Groups also generally allege the USFS relied upon NEPA only to inform federal decisionmakers instead of also pursuing the other "twin aim[]" of NEPA—facilitating public involvement. Response Br. at 83 (quoting *High Country Conservation Advocs. v. U.S. Forest Serv.,* 951 F.3d 1217, 1223 (10th Cir. 2020)). But they make no specific allegations as to how public involvement was not facilitated. As the EIS and 2019 ROD indicate, the USFS provided several opportunities for public notice and comment and held several public hearings regarding the project. Specifically, the USFS opened a public comment period on the draft 2019 ROD, prior to issuing the final 2019 ROD. And the USFS provided detailed responses to the comments it received in an extensive Response to Comments document in November 2018, prior to issuing the 2019 ROD. In any event, the regulations state that "[a]n agency *may* request comments on a final environmental impact statement before the decision is finally made." 40 CFR § 1503.1(b) (emphasis added). There is no requirement that an agency open a ROD to public comment once the underlying EIS is final. *See id.* § 1503.1(a).

agencies to prepare an EIS for "proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. §§ 1502.1–1502.24 (1978)[10] (relating to the EIS requirement).

In taking a hard look at the environmental consequences of a proposed action, the agencies must consider the direct, indirect, and cumulative environmental impacts of the action. 40 C.F.R. §§ 1502.16 (environmental consequences), 1508.7 (cumulative impact), 1508.8 (direct and indirect effects). When "considering whether the agency took a 'hard look,' we consider only the agency's reasoning at the time of decisionmaking, excluding post-hoc rationalization concocted by counsel in briefs or argument." *Richardson*, 565 F.3d at 704. We may also consider non-NEPA documents that have been incorporated by reference into the NEPA documents. *See* 40 C.F.R. § 1502.21 (requiring agencies to "incorporate material into an [EIS] by reference" to "cut down on bulk"). However, on a hard look review under NEPA, we do not "decide the propriety of competing methodologies"; we instead "determine simply whether the challenged method had a rational basis and took into consideration the relevant factors." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 782 (10th Cir. 2006) (quotation marks omitted). "Deficiencies in an EIS that are mere 'flyspecks' and do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal." *Richardson*, 565 F.3d at 704.

---

[10] The agency decision at issue was released prior to the 2020 amendments, so we cite to the prior versions of the regulations.

2.      **Direct and Indirect Effects**

First, we review the Conservation Groups' challenge to how the USFS categorized

the effects of the right-of-way in the EIS and 2019 ROD. The Conservation Groups

allege that the USFS acted arbitrarily and capriciously in categorizing the LMJV's

proposed development as an indirect effect of the right-of-way, rather than a direct

effect.[11] We disagree, but nevertheless conclude that the Conservation Groups have failed

to demonstrate prejudice from the alleged categorization error.

Under NEPA's implementing regulations, direct effects are those "caused by the

action [that] occur at the same time and place," and indirect effects are "caused by the

action and are later in time or farther removed in distance, but are still reasonably

foreseeable." 40 C.F.R. § 1508.8. For effects in either of these categories, the agency

must evaluate the "'ecological[,] . . . economic, [and] social' impacts of a proposed

action." *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174,

1190 (D. Colo. 2014) (alterations in original) (quoting 40 C.F.R. § 1508.8).

Under the regulatory definitions, LMJV's proposed development is an indirect

effect of the right-of-way. The development plans have yet to be set and are thus removed

in time, excluding them from the definition of "direct effects." But they are nevertheless

foreseeable, thereby bringing them within the ambit of "indirect effects." *See* 40 C.F.R.

§ 1508.8. Furthermore, the plans would cause "induced changes in the pattern of land

---

[11] The Conservation Groups' position that the LMJV development is a direct effect and therefore a federal action appears in tension with their argument that the FWS acted improperly when it issued an ITS under § 7 of the ESA that encompassed both the right-of-way and the proposed development on the LMJV Parcel.

40

use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems," which the regulations describe as characteristic of indirect effects. *Id.* § 1508.8(b). The Conservation Groups argue, however, that the development will result from construction of the right-of-way, and therefore it will be a direct effect of the action. But the Conservation Groups fail to demonstrate that the development would occur at the "*same* time," especially when development plans have yet to be finalized. *See id.* § 1508.8(a) (emphasis added). Accordingly, the Agencies properly treated the LMJV development as an indirect effect of the right-of-way.[12]

But even assuming the Conservation Groups are correct that the development should have been characterized as a direct effect of the right-of-way alternative, they fail to identify any harmful impact from that presumed mischaracterization. The Conservation Groups merely state that categorizing an effect as a direct effect properly informs the public of an immediate effect. They assert that "[c]orrect categorization . . . allows consistent comparison of effects across a reasonable range of alternatives that may result in differing temporal and spatial impacts." Response Br. at 89. But the

---

[12] Additionally, LMJV correctly identified the requirement that the Conservation Groups show prejudice flowing from the error, and the Conservation Groups failed to respond by identifying any record support for their contention. Irrespective of the merits of their contention, the Conservation Groups have failed to demonstrate prejudicial error stemming from the USFS's categorization of LMJV's proposed development in its review of the right-of-way in the EIS and 2019 ROD. *See* 5 U.S.C. 706 (in reviewing a challenge to an agency action under the APA, "due account shall be taken of the rule of prejudicial error); *see, e.g.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) (holding that a stray erroneous statement in the Federal Register "which could have had no effect on the underlying agency action being challenged" is not "the type of error that requires a remand").

Conservation Groups do not explain what change in the analysis or conclusion would result if the USFS had categorized LMJV's development as a direct effect rather than an indirect effect. Nor do they identify any harm caused by the USFS's alleged failure to categorize LMJV's development proposal as a direct effect. *See Richardson*, 565 F.3d at 704; *WildEarth Guardians*, 703 F.3d at 1183. Thus, the Conservation Groups have failed to meet their burden.

Our independent review of the record indicates that the USFS carefully considered the potential effects of developing the LMJV Parcel into a resort village. In the executive summary of the EIS, the USFS explained:

> [I]n order to adequately disclose the range of indirect effects associated with private land development that could occur as a result of Forest Service approval of either a land exchange or a road access corridor across [USFS] lands, a range of development concepts, including Low, Moderate and Maximum Density, has been evaluated for each Action Alternative.

LMJV App. Vol. IX at 2319. The USFS then extensively analyzed the environmental impacts of low, moderate, and maximum density development concepts for the LMJV Parcel. That analysis explicitly considered the impacts of each type of development on landscape disturbances, air quality, vegetation, and water flow, among other factors, and evaluated how the ultimate size of the development would interact with each of the federal actions proposed. The Conservation Groups identify no support from the record, and we have located none, for the proposition that categorizing the effects of the LMJV development as indirect, even if erroneous, had any harmful impact on the USFS's NEPA review.

42

The Conservation Groups also make a vague assertion that the Agencies did not properly consider the full range of alternatives available due to the alleged failure to properly categorize LMJV's development proposals. To support this argument, the Conservation Groups quote *Richardson* for the proposition that "[w]ithout substantive, comparative environmental impact information regarding other possible courses of action, the ability of an EIS to inform agency deliberation and facilitate public involvement would be greatly degraded." Response Br. at 89–90 (quoting *Richardson*, 565 F.3d at 708). However, *Richardson* concerns a failure by the BLM to consider reasonable alternatives to a land leasing proposal for oil drilling that were raised repeatedly during the public comment period and formal protest period, and which were directly cited and discussed by the petitioner on appeal. *Richardson*, 565 F.3d at 708–09. The Conservation Groups cite no specific alternatives raised before the USFS but not considered here. And the Agencies expressly took a hard look at the impact on the environment of each of three possible development proposals for the LMJV Parcel. Accordingly, *Richardson* is unhelpful to the Conservation Groups' arguments.

In sum, we see no basis in the record for concluding that the USFS mischaracterized the effects of the LMJV development, let alone that any alleged miscategorization undermined the purpose of NEPA.

### 3.    Cooperating Agencies

The Conservation Groups also challenge the USFS's decision not to proceed with any cooperating agencies in developing the EIS. Under our precedent, this challenge is unreviewable.

43

NEPA's implementing regulations provide that, "[u]pon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency." 40 C.F.R. § 1501.6. "In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency." *Id.*

We have previously held that, when the USFS denies a request by a state to participate as a cooperating agency in the NEPA process under 40 C.F.R. § 1501.6, "the applicable regulations provide no standard for a court to apply in reviewing the [USFS's] denial of such a request, and are likewise devoid of any standards or directives that would guide the [USFS] in granting or denying such a request[, meaning] there is simply no law to apply." *Wyoming*, 661 F.3d at 1242. Thus, while "[a]ll agency actions are presumed reviewable under the APA," under 5 U.S.C. § 701(a)(2), review is precluded "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* Although the *Wyoming* holding related to the participation of a state, rather than another federal agency, *id.* at 1241–42, we relied on the same regulation and its applicable language in *Wyoming* as the Conservation Groups place at issue here, and we can ascertain no basis for deviating from our prior holding. As a result, we lack authority to review the USFS's decision not to confer with cooperating agencies in developing the EIS.

### 4. Major Federal Action

Finally, the Conservation Groups argue that the EIS arbitrarily and capriciously failed to categorize LMJV's development as part of a major federal action, despite

the district court's prior questioning of the USFS on this issue and despite the alleged power the USFS retained when it exchanged land with LMJV's predecessor in 1987.[13] But the Conservation Groups fail to show how this alleged mischaracterization of the development in the EIS impacted the 2019 ROD. And in any event, the USFS properly categorized LMJV's proposed development as a nonfederal action that does not rise to the level of a major federal action.

Under NEPA, "[w]e have defined major federal action as actions by the federal government . . . and nonfederal actions with effects that may be major and which are potentially subject to Federal control and responsibility." *Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir. 1998) (internal quotation marks omitted). "In effect, major federal action means that the federal government has actual power to control the project." *Id.* (internal quotation marks omitted). We previously explained that nonfederal activities amount to "major federal action" in instances including "the filing of documents with a federal agency, when the filing is a necessary but insufficient step to gain eligibility to apply for federal funds for a nonfederal project, and an agency's approval of an Indian tribe's lease of its lands to nonfederal lessees." *Sierra Club v. Hodel*, 848 F.2d 1068, 1089–90 (10th Cir. 1988), *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992). Conversely, we have held that a duty to ensure a local government does not

---

[13] Again, if the LMJV Parcel development were a major federal action, there is little doubt it could be included in an ITS issued under § 7 of the ESA. *See infra* Section II.F.2 (discussion of § 7 and § 10 of the ESA). LMJV's arguments remain internally inconsistent on these points.

exceed the bounds of a BLM right-of-way does not convert actions taken within the right-of-way into a federal action, unless there is, for example, a mandatory regulatory duty placed upon the agency to ensure the nonfederal actions do not produce environmental harms the agency is affirmatively responsible for preventing. *Id.* at 1090–91. We further suggested in *Hodel* that when federal control over an aspect of a nonfederal action is discretionary, it does not rise to the level of a major federal action. *Id.* at 1090.

When the USFS conveyed the ski village property in exchange for property formerly held by LMJV's predecessor, it retained a Scenic Easement over the LMJV Parcel that places esthetic limits and restrictions on the uses of the property. That Scenic Easement also requires the supervisor of the Rio Grande National Forest to approve any proposed development on the property. If the supervisor and LMJV cannot agree on the development plan after negotiation, the Scenic Easement anticipates they will engage in binding arbitration to resolve the dispute. The supervisor also retains discretion to waive enforcement of any portion of the Scenic Easement.

The Conservation Groups allege that the Agencies erred by construing the definition of major federal action too narrowly, pointing to our decision in *Ross*. But the Conservation Groups read *Ross* too broadly. In *Ross*, we held that a road project is a major federal action when contemplated and funded by the federal government, even after federal funding is withdrawn at an advanced stage of the project. *Ross*, 162 F.3d at 1051–53. Here, we are faced with a proposed development on a privately

46

owned parcel of land encumbered by a Scenic Easement. Importantly, no public funding has or will be provided for LMJV's use in development of the Parcel. Thus, while the Rio Grande National Forest retains the right to object to LMJV's development plans, the government's involvement here is not analogous to that in *Ross*.

As the Agencies accurately note, the supervisor's authority over the development of the Parcel is further limited by the scope of the oversight power: the supervisor may only provide, within a thirty-day period of receiving a development proposal, "all reasonable objections which the Grantee has to such plans on the grounds of non-compliance with the terms of this [Scenic Easement]." Agencies App. Vol. I at 238. To the extent LMJV disagrees, the binding nature of arbitration limits the supervisor's power to dictate the parameters of the development. And the supervisor may waive any of the Scenic Easement restrictions. This framework suggests that the supervisor's approval of LMJV's development plans is more discretionary than mandatory, thereby disqualifying the approval process from treatment as a major federal action. *See Hodel*, 848 F.2d at 1090.

Nevertheless, it is the challengers' burden to identify how an error has harmed them. Here, the Conservation Groups neglect to explain how the failure to categorize LMJV's development as part of a major federal action caused them harm. That omission proves detrimental to their argument, particularly where the EIS extensively reviewed— for three levels of potential density—the development proposal's impacts on the

environment.[14] *See, e.g.*, *Eagle Cnty., Colo. v. Surface Transp. Bd.*, 82 F.4th 1152, 1176 (D.C. Cir. 2023) ("Even if the [agency] erroneously characterized the impacts related to increased oil production as cumulative impacts, Petitioners identify no way in which this decision materially affected the Board's analysis under NEPA."); *Richardson*, 565 F.3d at 704; *WildEarth Guardians*, 703 F.3d at 1183 (requiring a show of prejudice from an alleged NEPA violation). Thus, although the Agencies did not consider the LMJV's future development of the ski village as a major federal action, it considered the impact of that development as part of its assessment of the environmental effects of the right-of-way. The Conservation Groups offer no explanation as to how the analysis would have been different if the Agencies had instead characterized the LMJV development itself as a major federal action.

In sum, the USFS did not violate NEPA in preparing the EIS or the 2019 ROD. We accordingly affirm the 2019 ROD under NEPA.

---

[14] The Conservation Groups also allege that the USFS intentionally did not correct the deficiencies outlined by the 2017 district court order, citing the USFS's statement in its subsequent SIR that it "does not intend to correct deficiencies identified by the district court." Response Br. at 53 (quoting Agencies App. Vol. III at 607). In context, this quote merely identifies the limited purpose of the SIR. *See* Agencies App. Vol. III at 607 ("This SIR does not constitute a National Environmental Policy Act (NEPA) decision nor does it intend to fulfill the requirements for a revised or supplemental NEPA analysis. This SIR does not intend to correct deficiencies identified by the district court."). Furthermore, according to agency regulations, SIRs are meant to address whether there are changes to environmental circumstances or whether new proposed agency actions may change prior environmental impact analyses. *See* 40 C.F.R. § 1502.9(d). The district court did not focus on environmental circumstances in its decision to set aside the 2015 ROD. Thus, the Conservation Groups have provided us with no rationale for setting aside the analysis in the SIR.

### F.    ESA

Finally, we address the Conservation Groups' challenge to the 2018 BiOp and accompanying ITS under the ESA. "[I]n examining whether the [FWS's] actions violate the ESA, we rely on the standards of review provided in the APA." *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998). We conclude the Agencies did not violate the ESA by extending a permit for the incidental take to the LMJV Parcel under § 7, nor was any conclusion of the 2018 BiOp or corresponding ITS arbitrary and capricious.

### 1.    ESA Overview

The ESA, enacted in 1973, provides protection to endangered and threatened species. 16 U.S.C. § 1531(b); Endangered Species Act of 1973, Pub. L. No. 93–205, 87 Stat. 884. To advance this goal, the ESA requires the FWS to list endangered and threatened species and to designate critical habitat for those species. 16 U.S.C. § 1533(a). Under § 9 of the ESA, a "take" of any species listed as endangered is prohibited. *Id.* § 1538(a)(1)(B). "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id.* § 1532(19).

Initially, the ESA lacked a method by which incidental takes of endangered species could be authorized. Congress addressed this issue in the Endangered Species Act Amendments of 1982. Pub. L. No. 97-304, §§ 4, 6, 96 Stat. 1411, 1147–20, 1422–25. Once a species is listed and a critical habitat is designated, federal agencies are required under § 7 of the ESA to,

49

in consultation with and with the assistance of the Secretary, insure that *any action authorized, funded, or carried out by such agency . . .* is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical.

16 U.S.C. § 1536(a)(2) (emphasis added). "During consultation, the FWS 'evaluates the effects of the proposed action on the survival of [the] species and any potential destruction or adverse modification of critical habitat' and, 'based on the best scientific and commercial data available,' formulates a [BiOp]." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1105 (10th Cir. 2010) (first alteration in original) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 924 (9th Cir. 2008)).

A BiOp "is a written statement determining whether the proposed action 'is likely to jeopardize the continued existence of listed species.'" *Id.* (quoting 50 C.F.R. § 402.14(g)(4)). "If the [BiOp] concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat . . . the consulting agency can issue an [ITS] . . . ." *Id.* at 1105–06 (quoting *Nat'l Wildlife Fed'n*, 524 F.3d at 924) (internal quotation marks omitted). Pursuant to the ESA Amendments of 1982, "[a]n [ITS] 'constitutes a permit authorizing the action agency to take the endangered or threatened species so long as it respects the [FWS's] terms and conditions.'" *Id.* at 1106 (third alteration in original) (quoting *Bennett v. Spear,* 520 U.S. 154, 170 (1997)); *see also* Endangered Species Act Amendments of 1982 § 4. Commentators have called the ITS "the incidental take permit of [§] 7." Donald L. Soderberg & Paul E. Larsen, *Triggering Section 7: Federal Land Sales and "Incidental Take" Permits*,

50

6 J. Land Use & Env't L. 169, 193 (1991). Among the statutory factors the FWS must consider in issuing an ITS is whether "the taking of an endangered species or a threatened species incidental to the agency action will not violate [§ 7(a)(2)]." 16 U.S.C. § 1536(b)(4)(B). "The FWS must issue an [ITS] if the BiOp concludes no jeopardy to listed species or adverse modification of critical habitat will result from the proposed action, but the action is likely to result in incidental takings."[15] *Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007).

In 1982, Congress also amended the ESA to add § 10, a provision by which the state or private parties can request an incidental take permit ("ITP") for non-federal activities. Endangered Species Act Amendments of 1982, § 6; H.R. Rep. No. 97-567, at 31 (1982); *see also WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 622 F. Supp. 2d 1155 (D. Utah 2009) (affirming § 10 ITPs issued to a Utah municipality and Indian nation). Section 10 allows the FWS to grant an ITP to those parties carrying out an otherwise lawful activity which may result in the take of an endangered species within the United States, so long as the take is incidental to the action, rather than the purpose of the action. 16 U.S.C. § 1539(a)(1)(B). Applicants for a § 10 ITP

---

[15] There is no challenge here to the FWS's baseline conclusion that

> [a]fter reviewing the current status of lynx, the environmental baseline for the action area, the direct and indirect effects of the proposed action, and the cumulative effects, it is the Service's biological opinion that the proposed action is not likely to jeopardize the continued existence of lynx within the contiguous United States distinct population segment.

Agencies App. Vol. III at 720. There is also no challenge here to the FWS's previous determination that no critical habitat areas for lynx exist in Colorado.

51

face requirements in addition to those imposed on applicants for a § 7 ITS. For example, a § 10 ITP requires applicants to submit a detailed conservation plan, and mandates that the FWS open the permit application and related conservation plan to public comment before issuing the permit, with the permit subject to revocation if the applicant does not comply with its terms and conditions. 16 U.S.C. § 1539(a)(2). No such requirements are present in § 7. *See generally id.* § 1536.

Nothing in § 10 indicates any intent to limit the reach of § 7. Rather, § 10 provides a method for obtaining an ITP on projects lacking any federal nexus. We now consider which section of the ESA governs the issuance of a take permit here.

## 2.    Propriety of § 7 Analysis

The Conservation Groups challenge the Agencies' decision to include LMJV's proposed development within the scope of its § 7 review for the right-of-way. Under the plain language of the ESA and relevant authorities, we conclude the Agencies committed no legal error by extending the ITS in the 2018 BiOp to cover LMJV's proposed development.

The FWS declared in its 2018 BiOp that, although the USFS does not have jurisdiction over the LMJV development, the FWS would extend the ITS for the Canada lynx to cover the LMJV development, conditioned upon LMJV following "the Reasonable and Prudent Measures and Terms and Conditions [therein]." Agencies App. Vol. III at 722. The Conservation Groups question the propriety of the Agencies' inclusion of LMJV's development within the scope of a § 7 consultation, rather than requiring LMJV to undergo a separate § 10 consultation.

"Our primary task in construing statutes is to determine congressional intent, using traditional tools of statutory interpretation." *S. Furniture Leasing, Inc.*, 989 F.3d at 1146 (quotation marks omitted). "When interpreting a statute, we begin by examining the statute's plain language, and if the statutory language is clear, our analysis ordinarily ends." *Seale*, 32 F.4th at 1024 (internal quotation marks omitted). "[Tools of statutory interpretation] include examination of the statute's text, structure, purpose, history, and relationship to other statutes." *Am. Fed'n of Gov't Emps.,* 836 F.3d at 1295.

Recall that under § 7 of the ESA, "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ." 16 U.S.C. § 1536(a)(2). If following this review,

> the Secretary concludes that . . . the taking of an endangered species or a threatened species *incidental to the agency action* will not violate [subsection (a)(2)] . . . the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—(i) specifies the impact of such incidental taking on the species, (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact, . . . and (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both.

*Id.* § 1536(b)(4) (emphasis added).

The Conservation Groups assert that, by disavowing federal power over development of the LMJV Parcel,[16] the Agencies have removed all grounds for expanding a § 7 ITS to a non-federally controlled property. But § 7 not only provides that where any action "authorized" by the agency is "likely to jeopardize the continued existence of any endangered species or threatened species," the Secretary shall suggest reasonable and prudent alternatives that "can be taken by the Federal agency *or applicant* in implementing the agency action." 16 U.S.C. § 1536(a)(2), (b)(3)(A) (emphasis added). Section 7 also instructs the FWS to consider in issuing an ITS whether "the taking of an endangered species or a threatened species *incidental* to the agency action will not violate [§ 7(a)(2)]." 16 U.S.C. § 1536(b)(4)(B) (emphasis added). Unlike NEPA, the ESA does not define the term "incidental." As the Agencies illustrate, however, activities on an inholding accessed by a federally conveyed right-of-way naturally fit within the dictionary definition of "incidental." The Oxford American Dictionary defined "incidental" as "occurring as a minor accompaniment," "liable to occur in consequence of or in connection with something," or "casual, occurring by chance." *Incidental*, Oxford American Dictionary (Oxford University Press 1980). Use of an inholding will flow from a grant of access to the inholding, and beyond the limitations naturally created by the right-of-way itself, the grantor may be unable to anticipate or control all uses of the inholding. The application of § 7 to incidental takes therefore

---

[16] The Agencies concede that the Rio Grande National Forest retains the right to approve LMJV's development plans. Agencies Br. at 37–39. Thus, the Agencies have not disavowed all federal power over the development.

suggests congressional intent to permit broad application of the ITS regime, thereby allowing FWS to impose conservation measures controlling the impacts on an endangered species caused by development of a property made accessible by the right-of-way.

The Fifth Circuit reached the same conclusion regarding the broad reach of a § 7 analysis in a decision instructive to the present dispute. In *National Wildlife Federation v. Coleman*, 529 F.2d 359 (5th Cir. 1976), conservation groups sought to enjoin construction of a section of interstate highway due to its impact on the endangered Sandhill Crane. The district court dismissed the action and the conservation groups appealed. *Id.* at 361–62. The Fifth Circuit reversed, holding that the § 7 analysis under the ESA was deficient for its failure to incorporate the commercial and residential development that would likely result from the construction of the proposed highway interchange. *Id.* at 373–74. The circuit court explained: "The fact that the private development surrounding the highway and the [proposed highway interchange] does not result from direct federal action does not lessen the [agency's] duty under [§] 7." *Id.* at 374. Instead, the court held that the agency was required under § 7 to consider the indirect effects of the federal action and noted that "[p]rincipal among the indirect effects of the highway on the crane is the residential and commercial development that can be expected to result from the construction of the highway." *Id.* at 373.

Although *Coleman* was decided before adoption of § 10 of the ESA or the creation of the § 7 ITS regime, its interpretation of the reach of § 7 has been cited

favorably by this court after the 1982 amendments. Specifically, in *Riverside Irrigation District v. Andrews,* we explained that the Army Corps of Engineers:

> is required, under both the Clean Water Act and the Endangered Species Act, to consider the environmental impact of the discharge that it is authorizing. *To require it to ignore the indirect effects that result from its actions would be to require it to wear blinders that Congress has not chosen to impose. The fact that the reduction in water does not result "from direct federal action does not lessen the [agency's] duty under § 7 [of the Endangered Species Act]."*

758 F.2d 508, 512 (10th Cir. 1985) (second alteration in original; emphasis added) (quoting *Coleman*, 529 F.2d at 374).

Thus, the plain language of § 7 and our own precedent supports consideration of indirect effects of federal action, including future development of lands rendered accessible by the agency action.[17] Here, the Agencies have consistently treated the future development of the LMJV Parcel as an indirect effect of the agency action under both NEPA and the ESA. As such, the FWS was required to consider the impact of the development of the LMJV Parcel on the lynx as part of its § 7 analysis.

---

[17] The District of Colorado similarly concluded that a § 7 analysis under the ESA requires consideration of the indirect effects of a federal right-of-way. In *Sierra Club v. United States*, 255 F. Supp. 2d 1177, 1187–89 (D. Colo. 2002), the district court held that the Department of Energy improperly failed to address the impacts of a mining project made possible by the right-of-way on an endangered species living in the affected property, although the species was not listed as endangered until after the easement was granted. The court noted that, as it found under its NEPA analysis of the same agency action, "the mine and the Easement are 'interrelated,' or 'connected' actions because the road has no purpose other than to provide access to the mine." *Id.* at 1188.

Additionally, without § 7, the Agencies would have no ability to impose conservation measures on LMJV's development of the Parcel. There is no affirmative requirement that LMJV seek a § 10 permit. *See Defs. of Wildlife v. Bernal*, 204 F.3d 920, 927 (9th Cir. 2000). And as the 2018 BiOp explains and supports with scientific literature, the take of lynx due to habitat modifications is nearly impossible to calculate or to detect. The 2018 BiOp notes that lynx will avoid the development activities, but that the development activities will nevertheless result in habitat loss. If LMJV is not placed under an affirmative duty to undertake conservation measures as part of granting the right-of-way, LMJV may ultimately take lynx during development without consequence given the difficulty of determining whether there has been any take of lynx.[18] By including the development as an indirect effect of the federal action of granting the right-of-way and correspondingly covering LMJV's development in the ITS, the Agencies can impose conservation measures on LMJV that are designed to protect the lynx during and following development. *See, e.g.*, Agencies App Vol. III at 724 (requiring LMJV to conduct a "worker orientation concerning lynx conservation"); *id.* (providing on-site employee housing to minimize traffic impacts); *id.* (creating a lynx awareness program for property owners and guests to inform them of lynx movements in the area and their crossings of Highway 160).

---

[18] We acknowledge that the ESA provides civil and criminal penalties for unauthorized take. *See* 16 U.S.C. § 1540. But the difficulty here, is documenting whether any take of lynx has occurred, thereby making future penalties uncertain.

Critically, the conservation measures are not static. Should the Agencies conclude at any point going forward that the take of lynx resulting from the right-of-way easement and the LMJV development exceeds that permitted under the ITS, the authorized actions harm the lynx in a way not previously considered, or new information reveals effects on the lynx not already considered in the 2018 BiOp, the FWS is required to reinitiate § 7 consultation. *See* 50 C.F.R. § 402.16(a). Thus, § 7 allows the Agencies to impose conservation measures from the outset and to modify the conservation measures in response to changing circumstances or information.

In sum, the Agencies properly considered the right-of-way and the LMJV development under § 7 of the ESA and issued an ITS covering both the direct and incidental effects of the federal action on the lynx. We affirm the Agencies' decision to include the LMJVParcel in the scope of the § 7 take analysis.[19]

---

[19] Although we reach our conclusion independent of the FWS's internal guidance, we acknowledge that it is consistent with our conclusion regarding the plain meaning of ESA § 7. In the 2018 BiOp, the FWS explained that it relied on a 2003 Interagency Agreement titled "Application of the [ESA] to proposals for access to non-federal lands across lands administered by the [BLM] and [USFS]" (the "Interagency Agreement"). Agencies App. Vol. III at 697. The Interagency Agreement states in relevant part:

An applicant has a right to receive an [ITS], with reasonable and prudent measures, if take is anticipated from the access itself. The applicant also may desire to include reasonable and prudent measures in the [ITS] for take resulting from activities on non-federal land. If the applicant requests an [ITS] for take resulting from activities on non-federal lands, the activities on non-federal land may be analyzed in the [§] 7 consultation for the access application. If the applicant chooses to be covered through the [§] 7 consultation, then the [ITS] can include reasonable and prudent measures related to activities on non-federal land. If the applicant abides

58

**3.      Other Conclusions of the 2018 BiOp and ITS**

The Conservation Groups also challenge several of the conclusions reached in the 2018 BiOp and their application to the accompanying ITS as arbitrary and capricious. Specifically, they allege that the FWS did not rely on the best available science in reaching its take conclusions and used improper surrogates for determining take projections.[20] The Conservation Groups do not sufficiently substantiate their arguments and therefore do not meet their burden to challenge the 2018 BiOp and the accompanying ITS.[21]

First, the Conservation Groups allege that the 2018 BiOp's take projection is arbitrary and capricious because it fails to "account for take resulting from a wide

_____

by these measures, the applicant has ESA coverage for any associated take.

*Application of the Endangered Species Act to Proposals for Access to Non-Federal Lands Across Lands Administered by the Bureau of Land Management and the Forest Service*, at 3 (Jan. 2003), available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5345337.pdf.

[20] The Conservation Groups also raise arguments concerning the propriety of the 2013 BiOp. But they point to nothing in the record suggesting the Agencies relied on the 2013 BiOp in approving the right-of-way alternative in the 2019 ROD.
The Conservation Groups also attempt to incorporate by reference their briefing before the district court. Our precedent is clear, however, that "parties appearing before this court cannot satisfy Rule 28 by incorporating their claims by reference to either appendices or records from the court below." *United States v. Patterson*, 713 F.3d 1237, 1250 (10th Cir. 2013). We therefore do not consider any argument raised in this manner.

[21] Much like they do regarding the USFS's NEPA analysis, the Conservation Groups challenge the FWS's categorization of LMJV's development proposal as indirect effects, rather than direct effects, of the right-of-way under the ESA's

59

range of harms emanating from village construction, operations, water depletions, population influx, and other traffic related impacts." Response Br. at 98. According to the Conservation Groups, additional taking of lynx will result from significant habitat modification or degradation in the development area, and the FWS arbitrarily and capriciously failed to factor these impacts into its take analysis. Our review of the 2018 BiOp does not support the Conservation Groups' argument.

The Agencies concluded that the development of the ski village is the reason for the right-of-way and thus, development of the Parcel is an obvious, indirect effect of the agency action. *See* Agencies App. Vol. III at 714 ("[D]evelopment of the private lands [the Parcel] is reasonably certain to occur because the Applicant specifically requested access across the [Rio Grande National Forest] for development purposes."). Accordingly, the 2018 BiOP analyzed the indirect effects of the right-of-way by reviewing LMJV's development proposals and then assuming that any of the three possible levels of density for the LMJV development would render the entire Parcel "non-functional for lynx." *Id.* at 715. The 2018 BiOP explains:

---

governing regulations. But the cited regulation does not distinguish the result of categorizing an action as direct versus indirect, grouping direct and indirect effects into the definition of "[e]ffects of the action." 50 C.F.R. § 402.02. Furthermore, this argument undermines the Conservation Groups' assertion that § 7 cannot apply here, given clear precedential direction for the FWS to consider direct effects of federal actions under § 7. *See Riverside Irrigation District v. Andrews,* 758 F.2d 508, 512 (10th Cir. 1985). Again, the Conservative Groups' arguments are in tension with one another.

> The Village constitutes a base area development, and lynx are likely to avoid this base area development, rather than pass through it. . . . The Applicant anticipates a development timeframe of 30 years (i.e. full buildout completed in year 2051). We anticipate a steady reduction in lynx use of the private lands caused by removal of forested habitat for construction of infrastructure, facilities, and housing, and as human presence and activity increases.

*Id.*

Then, after reviewing pertinent scientific literature on the subject, the 2018 BiOp concludes "it is not possible to quantify the number of lynx that become susceptible to habitat loss and degradation," whereas "[q]uantifying the anticipated loss of lynx that may be injured or killed from a vehicle collision is relatively straight forward." *Id.* at 719. Thus, the Agencies did factor the impact of the LMJV development activities on the lynx into the ESA analysis and provided a reasonable basis for why the ITS focused on how to reduce traffic volume on Highway 160 and the right-of-way easement. Besides, while the Conservation Groups disagree with the 2018 BiOp's conclusions about the impact on lynx, they offer no scientific support or any other explanation for their contrary opinion, and thus fail to meet their burden to show how this action is arbitrary and capricious. *See Wyoming*, 661 F.3d at 1227; *Am. Petroleum Inst.*, 81 F.4th at 1058. Because the FWS concluded that the development itself would not result in a calculable take, we find no basis to conclude that the FWS acted arbitrarily and capriciously in not including requirements specific to the development itself in issuing the accompanying ITS.

Next, the Conservation Groups target the FWS's rationale for reducing the take projection of Canada lynx in the 2018 BiOp compared to the 2013 BiOp. The

2018 BiOp concluded that granting the right-of-way to the LMJV parcel would result in the taking of one lynx every twenty years through hit-by-vehicle mortality. The 2018 BiOp acknowledged that this is a change from the 2013 BiOp's projection of the taking of one lynx every six years. The Conservation Groups argue the 2018 BiOp is not based on the best available science because the BiOp notes that "[d]iscovery or detection of lynx injury or mortality attributed to lynx-vehicle collision is very unlikely if the animal wanders away from the highway before it dies," but allegedly does not incorporate this reasoning into its conclusion. Response Br. at 99. But the FWS explains that because of the difficulty in detecting the mortality associated with lynx-vehicle collisions and with functional habitat loss, it relies upon traffic volume estimates "as a detectible and measurable surrogate to quantify take." Agencies App. Vol. III at 723. The FWS also relies on several studies indicating that, as the traffic volume on a roadway increases to approximately 5,000 vehicles per day, the risk to lynx increases, but the risk then decreases once the roadway surpasses 5,000 vehicles per day, because the higher traffic volume acts as a barrier and animals cease attempting to cross the roadway. The FWS's rationale for using this surrogate measure is well explained and does not overlook evidence on the record or fail to consider important aspects of this issue. The Conservation Groups therefore have not met their burden to show that the lynx-vehicle collision calculation is arbitrary and capricious. *See Wyoming*, 661 F.3d at 1227; *Am. Petroleum Inst.*, 81 F.4th at 1058.

Finally, the Conservation Groups claim that the reduction in the take projection of Canada lynx from one lynx every six years in the 2013 BiOp to one lynx every twenty years in the 2018 BiOp does not reflect the "best available science." Response Br. at 112. But the FWS thoroughly explains that this change in metric is the result of changes in the surrounding habitat due to forestry-related changes and updates in projected traffic based on new data from the state. The Conservation Groups present no other scientific evidence for their contention that the 2018 BiOp is inaccurate. Thus, they have failed to undermine the presumption of validity afforded to the FWS's action, or to establish that the FWS's analysis is arbitrary and capricious.

In sum, the FWS's statements are not contrary to the evidence before it, unsupported by substantial evidence, without consideration of important aspects of the problem, or contrary to congressional direction. *See Am. Petroleum Inst.*, 81 F.4th at 1058. We therefore affirm the FWS's analysis in the 2018 BiOp.[22]

### III.    CONCLUSION

We VACATE the district court's order and AFFIRM the 2018 BiOp and 2019 ROD.

---

[22] The Conservation Groups also criticize the 2018 BiOp for not considering the future development plans of the neighboring ski resort, calling it an "interrelated action." Response Br. at 108–10. But aside from assumptions that LMJV's development will trigger the ski resort's development plans, the Conservation Groups provide no assurance that such development will occur or what form it may take. Under these circumstances, the Conservation Groups have failed to present a valid challenge to the 2019 ROD.

**APPENDIX: GLOSSARY OF ACRONYMS**

| | |
|---|---|
| ANILCA | Alaska National Interest Lands Conservation Act |
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| ITP | Incidental Take Permit |
| ITS | Incidental Take Statement |
| LMJV | Leavell-McCombs Joint Venture |
| NEPA | National Environmental Policy Act |
| RMW | Rocky Mountain Wild |
| ROD | Record of Decision |
| SIR | Supplemental Information Report |
| USFS | U.S. Forest Service |

*Rocky Mountain Wild v. Dallas*, Nos. 22-1438, 22-1439

**EID**, Circuit Judge, concurring:

I agree that we must resolve this appeal as described in the Court's opinion because of how the parties litigated this case. I therefore join the Court's opinion in full. However, I write separately to clarify that for the purposes of this case we assume, but cannot here decide, that provisions of law such as NEPA and the ESA may constrain the Secretary's power to grant access to inholdings pursuant to ANILCA. We have not yet considered the effect of the "[n]otwithstanding any other provision of law" clause contained in § 3210(a) of ANILCA. Nor did the parties raise its application in this case. Accordingly, the question of how ANILCA interacts with other, potentially conflicting statutes remains open to resolve in a future case.

1